# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 18-1235V**
**Filed: June 9, 2026**

| | |
|---|---|
| KURT SONNENBURG,<br><br>              Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>              Respondent. | Special Master Horner |

*Mark Theodore Sadaka, Law Offices of Sadaka Associates, LLC, Englewood, NJ, for petitioner.*
*Rochelle Ilana Gillenson, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION[1]

On August 17, 2018, petitioner, Kurt Sonnenburg, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he suffered small fiber neuropathy caused by the influenza vaccination that he received on October 3, 2016.  (ECF No. 1.)  For the reasons set forth below, I conclude that petitioner is *not* entitled to an award of compensation.

### I.      Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute;

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] All references to "§ 300aa" below refer to the relevant section of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury. In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

In many cases, however, the vaccine recipient may have suffered an injury *not* of the type covered in the Vaccine Injury Table. In such instances, an alternative means exists to demonstrate entitlement to a Program award. That is, the petitioner may gain an award by showing that the recipient's injury was "caused-in-fact" by the vaccination in question. § 300aa-13(a)(1)(B); § 300aa-11(c)(1)(C)(ii). In such a situation, of course, the presumptions available under the Vaccine Injury Table are inoperative. The burden is on the petitioner to introduce evidence demonstrating that the vaccination actually caused the injury in question. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991). In this case, petitioner has not alleged an injury that appears on the Vaccine Injury Table. 42 C.F.R. § 100.3(a). Therefore, petitioner must demonstrate causation-in-fact.

The showing of causation-in-fact must satisfy the "preponderance of the evidence" standard, the same standard ordinarily used in tort litigation. § 300aa-13(a)(1)(A); *see also Althen*, 418 F.3d at 1278-79; *Hines*, 940 F.2d at 1525. Under that standard, petitioner must show that it is "more probable than not" that the vaccination was the cause of the injury. *Althen*, 418 F.3d at 1279. He need not show that the vaccination was the sole cause but must demonstrate that the vaccination was at least a "substantial factor" in causing the condition at issue and was a "but for" cause. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen*, 418 F.3d at 1278 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). Ultimately, petitioner must satisfy what has come to be known as the *Althen* test, which requires: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Id*.

A petitioner may not receive a Vaccine Program award based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Medical records are generally

viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. § 300aa-13(b)(1). A petitioner may rely upon circumstantial evidence. *See Althen*, 418 F.3d at 1280. Moreover, the *Althen* court noted that a petitioner need not necessarily supply evidence from medical literature supporting petitioner's causation contention, so long as the petitioner supplies the medical opinion of an expert. *Id*. at 1279-80. While scientific certainty is not required, that expert's opinion must be based on "sound and reliable" medical or scientific explanation. *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II.    Procedural History

This case was originally assigned to another special master. (ECF No. 4.) Petitioner filed medical records marked as Exhibits 1-11 in August of 2018. (ECF No. 7.) In November of 2018, petitioner filed an affidavit marked as Exhibit 12. (ECF No. 9.) Between July and October of 2019, petitioner submitted updated medical records marked Exhibits 13 and 15. (ECF Nos. 17, 23.) The case was reassigned to the undersigned in August of 2019. (ECF Nos. 19-20.)

On February 4, 2020, respondent filed his Rule 4(c) Report recommending against compensation. (ECF No. 26.) In April of 2020, petitioner filed additional medical records marked as Exhibit 16. (ECF No. 29.) Petitioner then filed an expert report by neurologist Alberto Martinez-Arizala, M.D. and accompanying medical literature in December. (ECF Nos. 34-35; Exs. 17-31.) Thereafter, respondent filed two responsive expert reports by immunologist You-Wen He, M.D., Ph.D., and neurologist Brian Callaghan, M.D., M.S., along with supporting medical literature. (ECF Nos. 39-41; Exs. A-D.)

On August 31, 2021, I held a Rule 5 status conference. (ECF No. 43.) During the conference, I noted that petitioner's diagnosis continued to be a threshold issue. (*Id*.) While Dr. Martinez-Arizala's report placed emphasis on the comprehensive testing

3

that petitioner underwent to rule out common causes of peripheral neuropathies, noticeably absent from his report was any substantial discussion of the specific factors that support a diagnosis of small fiber neuropathy. (*Id.* at 1.) Furthermore, I noted that Dr. Callaghan challenged the idea that petitioner's diagnosis fit within the diagnostic criteria for small fiber neuropathy. (*Id.*) As a result, I directed petitioner to file a supplemental expert report by Dr. Martinez-Arizala substantiating petitioner's small fiber neuropathy diagnosis. (*Id.* at 1-2.) Additionally, petitioner was directed to file any outstanding psychiatry records, as requested by respondent in his Rule 4(c) Report. (*Id.*) On November 29, 2021, petitioner filed updated medical records marked as Exhibit 32. (ECF No. 46.)

In May of 2022, petitioner filed a supplemental report by Dr. Martinez-Arizala along with supporting medical literature. (ECF Nos. 50-51; Exs. 33-42.) Additionally, petitioner filed a status report indicating that he intended to file an expert report by an immunologist in support of the reports already offered by Dr. Martinez-Arizala. (ECF No. 52.) Initially, petitioner filed an expert report by rheumatologist Arthur Brawer, M.D., in November of 2023. (ECF Nos. 70-71; Exs. 43-56.) However, I cautioned petitioner that Dr. Brawer had recently been subject to heavy criticism by multiple special masters for his opinions that touched on some of the same concepts offered in this case. (ECF No. 72, p. 1.) As a result, petitioner moved to strike Dr. Brawer's report and accompanying medical literature (ECF No. 75), and the undersigned granted petitioner's motion (ECF No. 77). Subsequently, petitioner filed an expert report by rheumatologist/immunologist M. Eric Gershwin, M.D. in December of 2023. (ECF No. 76; Exs. 57-58.) In response, respondent filed a supplemental expert report by Dr. He and accompanying medical literature. (ECF No. 80; Ex. E.) Thereafter, petitioner filed a supplemental expert report by Dr. Gershwin in September of 2024. (ECF No. 84; Ex. 59.) Petitioner filed the medical literature referenced in Dr. Gershwin's reports in January of 2025. (ECF No. 87; Exs. 60-97.)

Given that both diagnosis and causation remained in dispute, I determined that an entitlement hearing was ultimately appropriate in this case. (ECF No. 68.) The parties filed their prehearing briefs on January 23, 2025. (ECF Nos. 95, 97.) That same day, petitioner also filed the curriculum vitae for one of his treating providers, neurologist Paola Sandroni, M.D., marked as Exhibit 98. (ECF No. 99.) Petitioner filed a responsive brief on February 6, 2025. (ECF No. 105.) The following day, petitioner filed an additional article of medical literature marked as Exhibit 99.[3] (ECF No. 104.) The entitlement hearing was held on February 20, 2025 at the Office of Special Masters in Washington, D.C. (ECF No. 79; *see* Transcript of Proceedings ("Tr."), at ECF No. 110.) Petitioner provided testimony, and both parties presented testimony from their respective medical experts. (Tr. 3.) Accordingly, this case is now ripe for resolution of petitioner's entitlement to compensation.

---

[3] Although the evidentiary record was closed as per the prehearing order at ECF No. 85, petitioner was permitted to file an additional article of medical literature by Querol and Llexià marked as Exhibit 99 after petitioner's motion for leave to file out of time was granted in part. (ECF No. 102.)

4

### III.    Factual History

#### a.  As reflected in the medical records

On October 3, 2016, petitioner received the influenza vaccine at issue.  (Ex. 1, pp. 1-2.)  He was 55 years old at the time of vaccination with a preexisting medical history of fibromyalgia, asthma, obstructive sleep apnea, insomnia, hypertension, hyperlipidemia, irritable bowel syndrome, gastroesophageal reflux disease ("GERD"), esophageal spasms, impaired fasting glucose, anxiety, panic disorder, and atypical chest pain of unknown etiology.  (*E.g.*, *Id.* at 2; Ex. 2, pp. 5-7, 28, 76-77; Ex. 11, pp. 87, 94-95, 99, 152, 155, 158-59, 170-71; Ex. 13, p. 1.)  Although not documented in petitioner's pre-vaccination medical records, petitioner's post-vaccination medical records reflect that petitioner also had a preexisting history of fibromyalgia.  (Ex. 3, p. 2 (documenting petitioner's history of comorbid fibromyalgia); Ex. 2, p. 77 (electronic health record message from petitioner to his primary care physician stating that petitioner was diagnosed with fibromyalgia in 2000).)

On October 4, 2016, petitioner presented to the emergency department with a chief complaint of chest pain.  (Ex. 11, p. 59.)  Petitioner reported that he developed chest tightness radiating to his left arm and neck, dyspnea, sweating, nausea, and a feeling of impending doom two days prior.  (*Id.*)  Although he took clonazepam, his symptoms did not resolve, which petitioner reported was typical for his severe episodes of chest pain.  (*Id.*)  After one to two hours, petitioner's symptoms resolved except for the chest tightness and associated radiating arm and neck pain.  (*Id.*)  Petitioner reported taking nitroglycerin, which was also ineffective despite providing some initial relief.  (*Id.*)  The treating provider noted that petitioner had been experiencing episodes of chest pain for at least the past ten years, and had undergone an extensive cardiac workup, which was unrevealing.  (*Id.*)  Given the relationship with panic symptoms, the treating provider documented that petitioner's chest pain could be related to his anxiety.  (*Id.*)  After conducting a physical exam, the treating provider concluded that petitioner's chest pain was consistent with his prior non-cardiac chest pain.  (*Id.* at 62.)  The treating provider noted that the true etiology of petitioner's non-cardiac chest pain was unclear and "likely multifactorial related to anxiety, GERD, esophageal spasm, and ill-fitting or malfunctioning CPAP."  (*Id.*)

On November 1, 2016, petitioner presented to his primary care physician, David Finnessy, M.D., complaining of a three-week history of burning and tingling in the bottom of his feet and a three-day history of constant tingling in his feet, the tops of his hands, and cheeks.  (Ex. 3, p. 1.)  Petitioner was noted to have a history of anxiety, fibromyalgia, and asthma.  (*Id.*)  Dr. Finnessy documented that petitioner had been experiencing sensory symptoms for approximately four weeks, noting that his symptoms first presented as an uncomfortable, intermittent burning sensation on the bottom of his feet.  (*Id.* at 2.)  The severity of petitioner's pain associated with this sensation fluctuated and improved with rest.  (*Id.*)  Petitioner reported that two weeks later, he started to experience a tingling sensation in the bottom of his feet that would

occasionally extend up to his ankles.  (*Id.*)  A week later, petitioner experienced warm sensitivity in his hands.  (*Id.*)  Furthermore, petitioner reported an "Icy-Hot sensation on his cheeks," which began a few days prior to the appointment.  (*Id.*)  Dr. Finnessy documented that petitioner appeared anxious, and petitioner reported feeling stressed due to his father suffering a recent illness.  (*Id.* at 1-2.)  On physical exam, petitioner was unable to consistently feel vibration and his sharp versus dull sensory discrimination in his feet was documented as non-intact.  (*Id.*)  Dr. Finnessy assessed petitioner with sensory peripheral neuropathy, noting that "[t]he differential here is quite broad."  (*Id.*)  He questioned whether petitioner's sensory symptoms were due to prolonged hyperglycemia versus Raynaud's syndrome.  (*Id.*)  Dr. Finnessy ordered bloodwork, including fasting glucose, which was unremarkable other than petitioner's glucose level, which was noted to be slightly elevated although not within the diabetic range.  (*Id.* at 2, 11-18.)  Dr. Finnessy then ordered a neurology consultation.  (*Id.* at 12.*)*

On November 4, 2016, petitioner followed up with Dr. Finnessy regarding his neurological symptoms.  (Ex. 3, pp. 21-29.)  At the appointment, petitioner reported he had started to experience throat symptoms that morning.  (*Id.* at 21.)  Specifically, petitioner noted "that he had a red hot feeling from his throat down to upper abdomen."  (*Id.*)  Petitioner denied heartburn and told Dr. Finnessy that his throat symptoms dissipated after he took clonazepam.  (*Id.*)  Petitioner continued to complain of intermittent burning sensations in his feet.  (*Id.*)  However, Dr. Finnessy noted that petitioner indicated the sensation in his foot had improved compared to his initial visit on November 1, 2016.  (*Id.*)  Dr. Finnessy documented that "[t]he etiology of his polyneuropathy remains a mystery."  (*Id.* at 22.)  He stated that he did not believe that "the degree of [petitioner's] hyperglycemia would account for his peripheral neuropathy."  (*Id.*)  Additionally, Dr. Finnessy remarked that some of the characteristics of petitioner's symptoms, including the perioral sensory abnormalities and the waxing and waning nature of his symptoms, are inconsistent with diabetic neuropathy.  (*Id*.)  The differential diagnosis included multiple sclerosis, Lyme disease, vitamin deficiency, or small fiber neuropathy.  (*Id.*)

On November 7, 2016, petitioner returned to Dr. Finnessy with a complaint of substernal burning overnight.  (Ex. 3, p. 30.)  Petitioner reported that he believed his CPAP was inflating his esophagus.  (*Id.*)  Dr. Finnessy noted petitioner's symptoms were consistent with an esophageal spasm and that petitioner had a history of esophageal spasms.  (*Id*. at 31.)  Petitioner underwent an EKG, chest x-ray, and CBC, which were all unremarkable.  (*Id*. at 31, 40-51.)  The next day, petitioner contacted his primary care clinic and reported that "[o]vernight developed burning in his ears and cheek bones" and substernal tightness, pressure, and burning.  (*Id.* at 36.)  He reported that upon taking clonazepam, the burning sensation was 90% resolved.  (*Id.*)

On November 9, 2016, petitioner presented to Rachel L. Werts, PA (Physician Assistant) for numbness and tingling.  (Ex. 10, pp. 11, 14.)  Petitioner reported a four-week history of numbness and a burning sensation that began in his toes and the bottoms of his feet.  (*Id.* at 14.)  Petitioner indicated that two weeks later, the numbness

and burning sensation traveled to his hands.  (*Id.*)  The burning and numbness traveled to his face a week later with petitioner noting he felt an icy hot sensation in his face. (*Id.*)  Additionally, petitioner reported that five days prior to his appointment with PA Werts, he experienced an esophageal spasm and atypical chest pain that led to a burning sensation in his throat.  (*Id.*)  At the time of the encounter, petitioner reported that he was not experiencing any numbness, tingling, or burning in his hands, although he stated that his hands felt weak, sore, and fatigued.  (*Id.*)  Petitioner denied that anxiety played a role in any of his symptoms.  (*Id.*)  During his neurological examination, petitioner reported that "'sharp feels less sharp at index fingertips and undersurface of 'great toe' bilaterally."  (*Id.* at 16.)  Petitioner's neurological examination was otherwise normal.  (*Id.* at 16-17.)  PA Werts stated that she believed petitioner "could benefit from a mental health evaluation and professional help for his anxiety."  (*Id.* at 17.)  Numbness, tingling, and dizziness and esophageal pain were listed as diagnoses for the encounter, and PA Werts referred petitioner to gastroenterology for further assessment of his chest pain and esophageal spasms.  (*Id.* at 17-18.)

On November 14, 2016, petitioner sent a series of electronic health record messages to internist Christopher A. Nestleroad, M.D., expressing concern that his symptoms were escalating.  (Ex. 2, pp. 53-56.)  Petitioner reported that over the weekend, his leg muscles felt sore and tired, and the burning sensation in his feet had extended up to the top of his calf.  (*Id.* at 56.)  He also noted that "last night, midnight, I woke up to my face and esophagus on fire. I took 1 mg of my clonazepam.[]  I woke up again at 3:30 am with chest tightness and some burning."  (*Id.*)  Further, petitioner stated "[t]his morning, my leg muscles continue to feel fatigued.  The back of my triceps are sore.  I feel very tired, as if I had been drugged.  There still is some burning sensation in my esophagus."  (*Id.*)  Moreover, petitioner noted that he experienced a "hot/cold sensation from butt muscles, all the way down my legs to my feet."  (*Id.* at 55.) He also reported feeling flushed in the face, fatigue, diminished appetite, and challenges with concentration.  (*Id.* at 56.)

The next day, petitioner sent a message regarding his throat pain, which he described as "its like having a red hot poker in the center of my esophagus."  (Ex. 2, p. 65.)  When petitioner was asked whether his throat pain could be attributed to a respiratory illness or acid reflux, petitioner declined and stated that "this is not anxiety related, this is a mechanical event" and described his throat pain as "synonymous to my neuropathy symptoms."  (*Id.* at 65, 69.)  Petitioner questioned whether Sjögren's syndrome had been considered.  (*Id.* at 65.)  A nurse responded, on behalf of Dr. Nestleroad and PA Werts, that "all the labs have come back normal and do not point to any diagnosis" and encouraged petitioner to schedule an appointment with behavioral health.  (*Id.* at 66, 69.)  When a nurse called petitioner to further discuss his symptoms, petitioner indicated that he would not see a therapist as he felt it would be a waste of time.  (*Id.* at 69.)

Petitioner sent an electronic health record message to Dr. Nestleroad on November 22, 2016, inquiring about his fibromyalgia.  (Ex. 2, pp.76-79.)  Petitioner reported that he "was diagnosed back in 2000 with Fibromyalgia" and asked whether his

7

gabapentin dosage could possibly be activating his fibromyalgia symptoms.  (*Id.* at 78-79.)  He reported that he was experiencing fatigued muscles, soreness all over, and difficulty concentrating at work.  (*Id.* at 79.)  Dr. Nestleroad indicated that gabapentin is used to treat fibromyalgia pain, but that it would be fine for petitioner to decrease his dosage.  (*Id.* at 78.)  Petitioner responded that he wished to continue the gabapentin to see if it alleviated any of his symptoms.  (*Id.* at 77.)

On November 23, 2016, petitioner underwent an EMG/NCS, which revealed chronic left L5 radiculopathy without active denervation and no evidence of distal polyneuropathy.  (Ex. 13, pp. 226-27.)  Dr. Nestleroad informed petitioner that his EMG results were normal and referred petitioner to neurology.  (Ex. 2, pp. 83-87.)

On December 2, 2016, petitioner called Dr. Nestleroad's office and reported intermittent episodes of lightheadedness, decreased heart rate, nausea, and mild chest tightness.  (Ex. 2, p. 100.)  Petitioner questioned whether gabapentin could be causing his symptoms and also reported that he had not taken clonazepam recently.  (*Id.* at 100-01.)  Dr. Nestleroad's team informed petitioner that gabapentin can cause some dizziness and vomiting and instructed petitioner to be seen in the emergency department if his symptoms worsened.  (*Id.* at 101.)  Petitioner sent a follow up message reporting that he went for a swim, which provided some initial relief, but approximately one hour after finishing his workout, the esophageal discomfort returned, which petitioner described as "[i]ts as if I had a golf ball stuck in the center of my esophagus."  (*Id.* at 89.)

Petitioner presented to urgent care on December 5, 2016, for assessment of a "wide variety [of] new neuro symptoms all of which came on 10 days after his flu shot this year on 10/3/16."  (Ex. 13, pp. 81, 83.)  The treating provider documented that petitioner reported experiencing "migratory parathesias hot poker feeling occasionally generalized and severe 'like I wanted to die[,]' now more migratory quarter size areas of this hot burning pain in throat[,] arms[,] chest[,] [and] legs."  (*Id.* at 83.)  Petitioner also reported fatigue, a new, one-day history of arm weakness, and decreased stamina and shortness of breath with exercise.  (*Id.* at 83-84.)  Petitioner expressed concern that he was possibly suffering from chronic inflammatory demyelinating polyneuropathy ("CIDP"), and that delayed treatment would be less effective.  (*Id.* at 86.)  The provider noted that petitioner's workup had included an MRI of the head and an EMG, which only revealed a left-sided L5 radiculopathy, but no polyneuropathy.  (*Id.* at 84.)  Petitioner's neurological exam was unrevealing, other than slight decreased sensation to light tough in both cheeks.  (*Id.* at 85.)  The provider reassured petitioner that his neurological exam was normal and instructed him to follow up with neurology as scheduled.  (*Id.* at 85-86.)  The provider documented his assessment as new onset of a variety of somatic complaints and painful parathesias of unknown etiology that began after petitioner's flu shot in October.  (*Id.* at 85.)

On December 14, 2016, petitioner was seen by neurologist Anne C. Weiss, D.O.  (Ex. 13, pp. 95-102.)  In documenting petitioner's history, Dr. Weiss noted that petitioner reported that he was feeling fine until shortly after his flu vaccine on October 3, 2016.

8

(*Id.* at 98.)  Petitioner reported that he first noticed burning on the bottom of his feet on October 11, 2016, and by October 16, 2016, he started experiencing tingling in his toes and felt that his skin felt hot and cold.  (*Id.*)  On October 19, 2016, petitioner stated that he experienced chest tightness and numb feet.  (*Id.*)  Additionally, petitioner reported experiencing cramping in his calf and thigh; numbness in the face, fingers, and feet; pain in his back and elsewhere; difficulty urinating and anal burning following a bowel movement; heaviness in his arms; an "Icy-Hot" sensation in the tops of his arms and legs; extreme fatigue and difficulty breathing; and a vibrating sensation in his spinal cord.  (*Id.* at 99.)  Dr. Weiss documented that petitioner's workup had been normal thus far, including a normal MRI of the brain, normal labs, and an EMG with repetitive stimulation that found no polyneuropathy.  (*Id.*)  She also recorded that petitioner appeared "somewhat anxious" and reported experiencing multiple familial stressors. (*Id.*)  On physical examination, petitioner's deep tendon reflexes in his extremities were 1/4, except for his triceps which were 2/4.  (*Id.* at 101.)  With regard to petitioner's sensory exam, Dr. Weiss noted "vibration is trace decreased at the toes versus the ankles."  (*Id.*)  Otherwise, petitioner's neurological exam was normal.  (*Id*.)  Based on her evaluation, Dr. Weiss documented that petitioner had multiple somatic complaints, including burning "that could potentially represent some type of small fiber neuropathy. On the other hand, many of his other symptoms are atypical, and it would be unusual for everything to spread so quickly.  EMG is negative for CIDP."  (*Id*.)  Additionally, Dr. Weiss noted that petitioner was experiencing multiple life stressors, which petitioner indicated came on after his symptoms started.  (*Id.*)  Her clinical plan included (1) to offer petitioner reassurance; (2) test for acetylcholine receptor binding antibodies, which she suspected would be negative; and (3) instruct petitioner to taper off gabapentin.  (*Id.* at 102.)  Dr. Weiss noted that a referral to the pain clinic may be appropriate if petitioner's symptoms continued.  (*Id.*)

On December 19, 2016, petitioner followed up with Dr. Finnessy regarding his neurological symptoms, including a burning sensation on the top of his arms and legs, face, and chest, as well as throat issues that caused trouble swallowing.  (Ex. 3, pp. 61-62.)  Petitioner reported that his symptoms were getting worse and that he was very upset by his appointment with UW Health Neurology.  (*Id*.)  Dr. Finnessy noted that petitioner "is convinced that he has CIDP which he thinks might have been related to the flu shot that he got Oct 3."  (*Id.* at 61.)  Additionally, Dr. Finnessy remarked that when petitioner relaxed at his health club, "nearly all of his symptoms resolved except for this foot numbness."  (*Id*.)  Petitioner also complained of persistent fatigue.  (*Id.* at 62.)  At this appointment, petitioner indicated his interest in getting a consult at the Mayo Clinic which Dr. Finnessy noted "would be a fine thing to do."  (*Id*.)  He advised petitioner to taper off gabapentin.  (*Id.*)

Between December 22, 2016 and January 17, 2017, petitioner exchanged multiple electronic health record messages with Dr. Finnessy regarding the pain, burning, numbness, and weakness he was experiencing in various parts of his body. (Ex. 3, pp. 68-123.)  On December 22, 2016, petitioner sent a message regarding a week to a week and a half history of persistent tension headaches lasting one to two hours per episode.  (*Id.* at 68-70.)  In a message sent the next day, petitioner indicated

9

his tension headaches were getting worse and noted that he was struggling to focus due to "burning/numb feet, cramps in the calves and thighs, burning che[e]ks, lips, ear lobes, testicles" and that he recently started experiencing a burning sensation in his tongue similar to the hot spot he experienced in his esophagus. (*Id.* at 73.)  Dr. Finnessy referred petitioner to the pain clinic for chronic pain associated with his neuropathy. (*Id.* at 75.)  In another message sent on December 27, 2016, petitioner implored Dr. Finnessy to find a way to treat his neuropathy and reported a recent onset of pain that he described as "needles and burning across the top of [his] skull" as well as some numbness around his eye sockets, in the tips of his ears, and on the top edge of his mouth. (*Id.* at 77.)  In response to this message, Dr. Finnessy called petitioner and documented that petitioner continued to have migratory pain, and that petitioner reported an improvement in the symptoms involving his feet. (*Id.* at 81.)  The next day, petitioner sent another message reporting that his head pain improved with floatation in a salt solution; however, he noted that that he experienced a few episodes of a vibrating sensation in his thumb and forefinger while floating. (*Id.* at 83-84.)  Additionally, he reported a new hot sensation on the back of his neck. (*Id.* at 84.)  In a message sent on January 2, 2017, petitioner reported an extremely intense burning spot in the center of his chest as well as a sensation that his chest, face, ears, neck, and tops of his arms were on fire. (*Id.* at 86.)  He questioned whether he was suffering from Sjögren's syndrome. (*Id.*)  On January 4, 2017, petitioner complained that the burning sensation on the tops of his arms, chest, face, and back of neck were inhibiting his sleep. (*Id.* at 97.)  The following day, petitioner indicated he had decreased appetite and noted that swallowing triggered the hot spot in the back of his throat. (*Id.* at 95.)  On January 6, 2017, petitioner reported an episode of pain in the top of his head that he described as feeling like needles were being inserted into his scalp as well as sticky eyes and dry mouth. (*Id.* at 101.)  He also noted he was experiencing intense heat sensation in the outside edges of his ears, around the bridge of his eyes, cheeks, back of his neck, back of his throat, and middle of his esophagus. (*Id.*)  He also reported experiencing intense body chills due to the hot and cold sensation. (*Id.*)  In another message, petitioner conveyed that he had experienced a sudden onset of weakness, lightheadedness, and low heart rate accompanied by fatigue, nausea, and body discomfort on January 16, 2017. (*Id.* at 122.)  He questioned whether this episode was an anxiety or panic attack or something completely unrelated given his low heart rate. (*Id.*)  On January 17, 2017, petitioner expressed concern about tingling that traveled from his fingers to his hands and a vibrating sensation in his tailbone. (*Id.* at 121.)

Upon a referral from Dr. Finnessy, petitioner presented to pain management for an initial evaluation on January 16, 2017. (Ex. 15, p. 145.)  The provider recorded that petitioner presented with "diffuse" non-dermatomal burning-like pain sensations that petitioner reported began approximately ten days following his flu vaccine administered in October of 2016. (*Id.* at 148.)  While the burning-like pain began in his extremities, petitioner reported experiencing burning in his neck, chest, and top of his head as well as with urination and defecation. (*Id.*)  While he had a preexisting diagnosis of fibromyalgia, petitioner reported that his current symptoms are different from what he experienced in the past. (*Id.* at 145.)  On physical exam, petitioner had tenderness in his extremities. (*Id.* at 148.)  The provider documented that there was no clear

10

diagnosis.  (*Id.*)  Further, the provider documented that given petitioner's history of fibromyalgia, anxiety, and panic disorder, it was unclear if petitioner's symptoms were due to a somatization disorder.  (*Id.*)  Accordingly, the provider recommended that petitioner be evaluated by pain psychology for cognitive behavioral therapy, progressive relaxation, and mindfulness training.  (*Id.*)

On January 25, 2017, petitioner sent an electronic health record message to Dr. Finnessy regarding his upcoming neurology evaluation at the Mayo Clinic.  (Ex. 3, pp. 140-41.)  Specifically, petitioner asked for Dr. Finnessy's opinion on what he should communicate regarding his condition given his negative workup, including a normal EMG, and considering that Dr. Finnessy did not feel petitioner's clinical presentation looked like small fiber neuropathy.  (*Id.*)  In his response, Dr. Finnessy stated "I would just retell your story in a[] succinct way and have test results and study results (EMG, MRI[,] etc) in hand.  I wouldn't try and lead him/her toward any particular diagnosis, because what we need is a fresh set of eyes."  (*Id.*)

On January 31, 2017, petitioner presented to neurologist Paola Sandroni, M.D., Ph.D., at Mayo Clinic in Rochester, Minnesota, for evaluation of peripheral neuropathy. (Ex. 5, pp. 28-30.)  In documenting petitioner's medical history, Dr. Sandroni noted that petitioner had "really no prior medical history of sort except for sleep apnea," and recorded that petitioner's symptoms began ten days after he received the flu vaccine. (*Id.* at 28.)  Additionally, she documented that petitioner's symptoms started with burning feet and some numbness of the toes, followed by thermal allodynia in the forearms and face as well as dysesthesia involving several parts of his body, including the face, throat, legs, chest, scalp, and genital area.  (*Id.*)  Further, Dr. Sandroni noted the variable nature of petitioner's symptoms and documented that petitioner had undergone extensive testing, which was unrevealing.  (*Id.*)  Petitioner's neurological exam was normal, and Dr. Sandroni documented that petitioner "was almost asymptomatic," except for a brisk knee jerk on the right, although this finding was not pathologic.  (*Id.* at 30.)  Dr. Sandroni diagnosed petitioner with inflammatory small fiber neuropathy, noting that "I think this is what happened and was an autoimmune response triggered by the flu shot, and the body attacked itself."  (*Id.*)  She ordered a full neurophysiologic assessment, including a lumbar puncture to test for inflammation, testing for large and small fiber neuropathy, and a paraneoplastic panel.  (*Id.*)  Dr. Sandroni recommended an infusion of magnesium followed by a five-day course of intravenous ("IV") Solu-Medrol.  (*Id.*)

After undergoing an extensive neurological workup, petitioner returned to Dr. Sandroni on February 2, 2017.  (Ex. 5, p. 8.)  Dr. Sandroni noted that petitioner's neurological evaluation "was, not surprisingly, pretty unremarkable."  (*Id.*)  Specifically, petitioner's thermoregulatory sweat test, quantitative sensory test (QST), skin biopsy for epidermal nerve fiber density, paraneoplastic autoantibody evaluation, and lumbar puncture were all normal.  (*Id.* at 1-3, 10-12, 14-16, 31-32.)  Although petitioner's EMG revealed evidence of old radiculopathies, Dr. Sandroni characterized this clinical finding as "inconsequential."  (*Id.* at 8.)  Petitioner's autonomic reflex screen was noted to be "minimally abnormal" in that it revealed mild cardio-vagal impairment with normal

11

adrenergic and post-ganglionic sudomotor function, which is a finding suggestive of a "very limited autonomic neuropathy." (*Id.* at 32-33.)  Dr. Sandroni diagnosed petitioner with post vaccine neuritis.  (*Id.* at 8.)

On February 8, 2017, petitioner followed up with Dr. Finnessy.  (Ex. 3, pp. 164-65.)  After reviewing petitioner's records from Mayo Clinic, Dr. Finnessy documented that petitioner "ultimately had a fairly normal evaluation other than an EMG which showed some old radiculopathies." (*Id.* at 164.)  Additionally, he noted that an autonomic reflex screen revealed mild cardio-vagal impairment and that petitioner was ultimately diagnosed with post-vaccine neuritis.  (*Id.* at 164-65.)  In his progress note, Dr. Finnessy documented that petitioner's pain changes from day to day, noting that petitioner continues to experience pain in various parts of his body ranging from his toes to his face.  (*Id.* at 165.)  Dr. Finnessy assessed petitioner with small fiber neuropathy secondary to his flu vaccine and recommended that petitioner not receive the flu vaccine in the future.  (*Id.*)

Petitioner followed up with Dr. Finnessy on March 7, 2017.  (Ex. 8, pp. 104-05.)  At this encounter, petitioner reported that while he initially was improving slowly, his symptoms were starting to worsen.  (*Id.* at 104.)  Petitioner indicated he was experiencing burning sensations over various parts of his body, and that he was ready to try IV Solu-Medrol.  (*Id.*)  Dr. Finnessy noted that "[w]e have gone back and forth now with the neuritis symptoms and what to do about them." (*Id.* at 105.)  He ordered Solu-Medrol infusions and listed post-vaccine polyneuritis as his assessment.  (*Id.*)  Petitioner started his five-day course of IV Solu-Medrol infusions on March 15, 2017.  (Ex. 15, p. 319.)

On March 21, 2017, petitioner returned to Dr. Finnessy, reporting that he experienced issues with sleep and elevated heart rate after the infusions.  (Ex. 8, pp. 133-34.)  Petitioner felt that the needle sensation and his cheek pain had improved with the infusions but now complained of diffuse itching.  (*Id.* at 134.)  He also reported epigastric cramping and discomfort.  (*Id.*)  After examining petitioner, Dr. Finnessy documented that petitioner's symptoms were improving in general, although he noted petitioner's diffuse itching and flushing.  (*Id.*)  He also assessed that petitioner's epigastric discomfort was likely secondary to gastritis induced by the Solu-Medrol infusions.  (*Id.*)

In late March of 2017, petitioner sent a series of electronic health record messages to Dr. Sandroni regarding his response to IV Solu-Medrol.  (*See generally* Ex. 7.)  While he reported that infusions provided some relief initially, petitioner noted that some of his symptoms had returned with intensity, including the burning on the bottoms of his feet and tension across the top of his head.  (*Id.* at 1.)  Petitioner indicated that he had been under extreme stress during the last month related to moving his elderly parents into a new facility, which he felt was interfering with his response to the infusions.  (*Id.*)  On March 31, 2017, petitioner sent an electronic health record message to Dr. Finnessy expressing that he was not feeling optimistic that the Solu-Medrol infusions were alleviating his symptoms.  (Ex. 8, pp. 148-49.)  Petitioner

12

noted that he was experiencing burning and a vibrating sensation in his feet and groin, and that he felt like he had a second-degree sunburn on the top of his arms and certain spots on his legs.  (*Id.*)

On April 4, 2017, petitioner returned to Dr. Finnessy.  (Ex. 8, pp. 150-51.)  Dr. Finnessy noted that petitioner had been dealing with burning skin pain since his flu vaccine in the fall of 2016, which was eventually diagnosed as post-vaccine polyneuritis after an evaluation at Mayo Clinic.  (*Id.* at 151.)  Petitioner experienced some temporary relief with magnesium and IV Solu-Medrol infusions; however, petitioner's burning sensations returned.  (*Id.*)  Specifically, petitioner noted that three weeks after his Solu-Medrol infusion, the burning in his feet returned.  (*Id.*)  At the time of the encounter, petitioner reported experiencing burning on his buttocks and groin with radiation to the back of his legs.  (*Id.*)  He also indicated that that the burning in his tongue had returned.  (*Id.*)  Petitioner reported feeling "beyond stressed out" due to family dynamics and questioned whether his anxiety was exacerbating his pain.  (*Id.*)  Dr. Finnessy documented that petitioner was scheduled to see a psychiatrist and remarked that addressing petitioner's anxiety was the "more fruitful route" to getting his pain under control.  (*Id.*)

On April 13, 2017, petitioner sent an electronic health record message to Dr. Finnessy regarding a "mega attack" of his atypical chest pain that he experienced the day prior.  (Ex. 8, pp. 161-64.)  Dr. Finnessy responded that he while it may be possible that petitioner's esophageal issues were causing his atypical chest pain, petitioner's panic attacks were also "a real possibility."  (*Id.*)  Petitioner presented for a gastroenterology evaluation on May 22, 2017.  (Ex. 15, pp. 417-23.)  In documenting petitioner's history, the provider noted that petitioner's atypical chest pain appeared to be associated with stress at times.  (*Id.* at 418.)  In that regard, the provider documented that petitioner recently experienced increased stress due to issues with his parents and that he was seeing a counselor.  (*Id.*)  The provider assessed that esophageal spasms seemed like a plausible explanation for petitioner's symptoms.  (*Id.* at 423.)

Petitioner followed up with Dr. Finnessy on May 26, 2017, complaining of neuropathy and a recent bout of bloating, fever, nausea, and diarrhea.  (Ex. 8, pp. 178-80.)  Dr. Finnessy documented that petitioner continued to experience an "off and on" course and that they discussed that petitioner's anxiety may be a possible contributing factor to his symptoms.  (*Id.* at 179.)  While petitioner saw a therapist, he did not continue with therapy due to a lack of a good therapeutic relationship.  (*Id.*)  Petitioner reported that he notices his pain is worse when he is stressed, and that the insanity of his family continued to be a source of stress.  (*Id.*)  Dr. Finnessy documented that petitioner's sensory symptoms were likely a result of both his polyneuritis and stress. (*Id.*)

Petitioner underwent an evaluation for psychotherapy in October of 2017.  (Ex. 15, pp. 666-71.)  The licensed social worker who evaluated petitioner reached a diagnosis of adjustment disorder with mixed anxiety and depressed mood.  (*Id.* at 666,

13

670.)  During his assessment, petitioner shared that he was dealing with two major issues: (1) health issues which he attributed to an adverse reaction to the flu vaccine; and (2) major stress due to family issues, including tensions with his siblings, the declining health of his parents and management of their finances, and a history of abuse from his father.  (*Id.* at 666-67, 670.)  Although petitioner denied experiencing anxiety, the provider noted that he appeared anxious.  (*Id.* at 667, 670.)  Petitioner had a couple of additional sessions with the social worker between October and January of 2018, who documented that petitioner was very angry and reactive and noted that they were working on coping mechanisms and management of his stress.  (*Id.* at 685-86, 731-32, 766-67, 785-86, 878-79.)

On April 2, 2018, petitioner started another five-day course of IV Solu-Medrol infusions.  (Ex. 15, p. 1078.)  Petitioner returned to Dr. Finnessy on April 24, 2018 for evaluation of his worsening polyneuritis.  (*Id.* at 1171-73.)  He documented that while petitioner had undergone magnesium and Solu-Medrol infusions, treatment of petitioner's neuropathy symptoms had largely been unsuccessful.  (*Id.* at 1171.)  Dr. Finnessy remarked that petitioner had a "waxing and waning course of neuropathy" and that petitioner was still experiencing a burning sensation in various parts of his body.  (*Id.*)  Additionally, he noted that there "was some association" between petitioner's neuropathy symptoms and stress.  (*Id.*)  While he had been evaluated by pain management in the past, petitioner requested a referral to a new pain management specialist for a second opinion.  (*Id.* at 1172.)  Dr. Finnessy assessed petitioner with polyneuritis and also noted that he was going to refer petitioner to neurology "to see if they can provide insight."  (*Id.*)

On May 7, 2018, petitioner was evaluated by neurologist Bryan Atkinson.  (Ex. 15, pp. 1194-99.)  Dr. Atkinson documented that petitioner presented for consultation regarding a history of diffuse and chronic body pain of a neuropathic nature, "that has had a fluctuating and somewhat migratory course since October 2016 when he obtained an influenza vaccine."  (*Id.* at 1194, 1199.)  Further, he noted that petitioner had undergone "an extensive but unremarkable neurological workup," including an evaluation at Mayo Clinic.  (*Id.* at 1194, 1199.)  Moreover, Dr. Atkinson recorded that an immune mediated etiology had been hypothesized, noting that petitioner had received IV Solu-Medrol that initially offered some short-term relief in 2017, but provided no benefit when repeated in 2018.  (*Id.* at 1194, 1199.)  Dr. Atkinson noted that there was "considerable variability" in petitioner's reported symptoms, documenting that petitioner described his persisting neuropathic pain as "hot and stabbing pains . . . experienced sickly in the feet and hands, the thighs, arms, the top of the head, and the tongue."  (*Id.* at 1194-95.)  In addition to IV Solu-Medrol, Dr. Atkinson indicated that petitioner's symptoms had previously been treated with duloxetine, amitriptyline, prednisone, gabapentin, IV magnesium, and tramadol, and remarked that "[o]verall none of these treatments have been very successful."  (*Id.* at 1195.)  Dr. Atkinson performed a neurological examination, which was normal other than diminished deep tendon reflexes.  (*Id.* at 1198-99.)  In documenting his assessment, Dr. Atkinson noted that "I informed [petitioner] today that I feel his further treatment options are somewhat

14

limited." (*Id.* at 1199.)  Petitioner agreed to restart gabapentin and was instructed to follow up with Dr. Atkinson in six weeks.  (*Id.* at 1199.)

In June of 2018, petitioner established care with a new primary care provider, Kenneth Felz, M.D.  (Ex. 32, p. 439.)  Petitioner reported a history of persistent neuropathy which was diagnosed by vaccine-caused polyneuropathy at the Mayo Clinic. (*Id.*)  Dr. Felz encouraged petitioner to continue to seek out expertise from specialists regarding the management of his pain and sensory symptoms.  (*Id.* at 440.)  He assessed petitioner with neuropathy.  (*Id.* at 442.)  Petitioner continued to follow up with Dr. Felz throughout 2018 with complaints of persistent pain and sensory symptoms. (*See generally id.* at 450-554.)  Dr. Felz ultimately recommended that petitioner consult another neurologist.  (*Id.* at 529, 543.)

On December 21, 2018, petitioner was evaluated by neurologist Ronald Zerofsky, M.D.  (Ex. 13, pp. 153-57.)  In documenting petitioner's history, Dr. Zerofsky noted that petitioner "has generalized probable neuropathic pain" that by history began after a flu shot.  (*Id.* at 156.)  Additionally, he remarked that petitioner was diagnosed with an autoimmune response to the flu vaccine at Mayo Clinic.  (*Id.* at 153, 156.) Further, Dr. Zerofsky documented that petitioner had undergone an extensive yet unrevealing workup.  (*Id.* at 156.)  Petitioner's neurological exam was unremarkable. (*Id.*)  He documented his impression as "presumed autoimmune neuropathy."  (*Id.* at 157.)  However, Dr. Zerofsky noted that petitioner continued to have very significant symptoms with an inadequate response to multiple different modalities of treatment. (*Id.*)  Petitioner followed up with Dr. Zerofsky in May of 2019.  (*Id.* at 183-85.)  Dr. Zerofsky documented that petitioner "does have very major stressors" and advised petitioner that these stressors were making his symptoms worse.  (*Id.* at 185.)

In April of 2020, petitioner had a multidisciplinary telephone call with the chronic pain team to discuss his ongoing neuropathy pain.  (Ex. 32, pp. 189-91.)  The multidisciplinary team included rehabilitation medicine, neurology, mental health, pharmacy, physical therapy, occupational therapy, pain nursing, and addiction medicine.  (*Id.* at 189.)  The documenting provider noted that petitioner developed a vaccine-related pain syndrome after receiving a flu vaccine in 2016.  (*Id.* at 189-90.) Despite undergoing an extensive evaluation, petitioner's "specific diagnosis is unclear other than a vaccine related pain syndrome with neuropathic features."  (*Id.* at 190.) Moreover, the provider noted that while petitioner had tried several different treatment modalities, none had been particularly effective.  (*Id.*)  The provider remarked that "[t]he pain itself is unusual" and that his clinical presentation and course "does not follow the pattern of peripheral neuropathy."  (*Id.*)

Petitioner continued to receive medical care for his chronic pain and sensory symptoms as well as other medical conditions through 2021.[4]  (*See generally* Exs. 13, 32.)  No medical records were filed for care beyond 2021.

---

[4] The undersigned has reviewed all of the medical records filed in this case; however, I do not find it necessary to summarize all of petitioner's later encounters.

15

### b. Testimony

Petitioner authored an affidavit in this case.  (Ex. 12.)  He also provided testimony at the hearing.  (Tr. 5-30.)  Petitioner recalled that he began experiencing a hot, burning, and prickly sensation in the bottom of his feet approximately 10 to 12 days after receiving his flu vaccine.  (Ex. 12, ¶ 7; Tr. 8.)  Despite this burning sensation, petitioner stated that his feet did not feel hot to the touch.  (Ex. 12, ¶ 7.)  This hot, burning sensation continued the next day with greater intensity.  (*Id.* at ¶ 8.)  Due to the escalation of this hot, burning sensation of his feet, petitioner contacted his primary care physician, Dr. Finnessy, and requested to have his glucose and A1C levels checked.  (*Id.* at ¶ 9.)  The results of the blood test indicated that petitioner was not pre-diabetic.  (*Id.*)

As time went on, petitioner noticed the same burning sensation in other areas of his body, including his cheeks, face, the top of his head, the top of his forearms, inner thighs and groin area, and testicles.  (Ex. 12, ¶ 11; Tr. 8-9.)  He stated, "[a]s each day passed, so did the intensity of the burning/stinging."  (Ex. 12, ¶ 11.)  Petitioner recalled one specific episode that occurred around Thanksgiving in 2016, where he "woke up abruptly around 2 am due to a 'burning' sensation across the entire surface of [his] body."  (*Id.* at ¶ 15.)  Petitioner described that episode as it "felt like my entire body was being boiled in oil, that I was on fire.  It was excruciatingly painful."  (Tr. 9.)  He took multiple doses of clonazepam to reduce his pain.  (Ex. 12, ¶ 15.)  Petitioner described another episode of pain occurring on December 25, 2016, comparing the sensation of pain he experienced "as if a hundred very sharp hot needles were being pressed into the top of [his] head."  (*Id.* at 19.)

Petitioner initially consulted his primary care provider, Dr. Finnessy, and other physicians, including a neurologist, but his workup was unremarkable.  (Ex. 12, ¶¶ 9, 12, 18-19.)  Thereafter, petitioner traveled to Mayo Clinic for a neurology evaluation in early 2017.  (Tr. 11-13; Ex. 12, ¶ 23.)  Petitioner stated that in February of 2017, he received a diagnosis of "an autoimmune response due to the influenza shot that [he] received in October 2016" by Dr. Sandroni, a leading neurologist at Mayo Clinic.  (Ex. 12, ¶ 23; Tr. 12-13.)  Additionally, petitioner averred that Dr. Sandroni told him that petitioner's autoimmune response to the flu vaccine had progressed to the point where there was nothing to be done to reverse it.  (Tr. 13.)  However, she did suggest trying infusions of Solu-Medrol.  (*Id.*; Ex. 12, ¶ 23.)  Petitioner underwent one course of IV treatment of Solu-Medrol in March 2017.  (Ex. 12, ¶ 23.)  Petitioner stated that while the treatment relieved pain that occurred in the top of his head, lips, throat, and groin, the symptoms started to return several months after treatment.  (*Id.*)  In March of 2018, Dr. Finnessy recommended petitioner undergo another course of IV Solu-Medrol.  (*Id.* at ¶ 24.)  However, petitioner noted that he suffered "many terrible side effects" and that many of his symptoms returned several weeks after completion of the treatment.  (*Id.*)

16

During the hearing, petitioner confirmed that he had been diagnosed with fibromyalgia prior to receiving the flu vaccine at issue. (Tr. 10, 19.) He testified that "[t]here is no comparison" between his fibromyalgia symptoms and the symptoms he experienced following his flu vaccine. (*Id.* at 10, 21.) Petitioner explained that his fibromyalgia symptoms always manifested as a sore and achy feeling in his back and did not extend to any other part of his body, including his extremities. (*Id.*) Therefore, petitioner disagrees with any suggestion that his fibromyalgia played a role in his pain and sensory symptoms. (*Id.* at 16-17.) Moreover, petitioner maintained that he does not have anxiety, stating that "[t]he anxiety stamp came from an ER visit, only to be found that it was actually a physical manifestation, not a mental manifestation." (*Id.* at 17.) However, he admitted on cross examination that he did start questioning whether anxiety was contributing to his pain and sensory symptoms. (*Id.* at 26.) Additionally, petitioner also agreed he had a preexisting history of atypical chest pain and esophageal spasms. (*Id.* at 23-24.) He acknowledged that treating providers have attributed his chest pains to anxiety. (*Id.* at 24.) However, petitioner explained that he discovered that his CPAP machine was overstimulating his esophageal airway, which was contributing to his chest pain and esophageal symptoms rather than an anxiety. (*Id.* at 25-26.)

Petitioner averred that since receiving the flu vaccine at issue, he has experienced difficulty concentrating due to chronic pain, headaches, hot/cold sensations across the surface of his skin, difficulty with complete urination, burning with bowel movements, pain in the groin and buttocks with prolonged sitting, burning hands and forearms, difficulty sleeping due to the burning sensations, and difficulty. (Ex. 12, ¶ 21; Tr. 13-15.) Additionally, petitioner indicated that his symptoms have negatively impacted his friendships, engage in social and everyday activities, and perform physical activity. (Tr. 14-15, 17-18; Ex. 12, ¶¶ 26-27.)

## IV.    Summary of Expert Opinions

### a.  Petitioner's Expert Neurologist, Alberto Martinez-Arizala, M.D.[5]

---

[5] Dr. Martinez-Arizala received his bachelor's degree in chemistry from Florida State University in 1975 and his medical degree from the University of Miami School of Medicine in 1979. (Ex. 18, p. 1.) In 1980, he completed his internship at Walter Reed Army Medical Center in Washington, D.C. (*Id.*) Dr. Martinez-Arizala completed his residency in neurology at Letterman Army Medical Center in San Francisco, California in 1983. (*Id.*) Upon completing his residency, Dr. Martinez-Arizala continued his service with the U.S. Army Medical Corps as a staff neurologist and staff scientist for several years. (*Id.* at 2-3; Tr. 34.) After finishing his active service with the U.S. Army, Dr. Martinez-Arizala held numerous academic appointments, with professorships in neurology at the Uniformed Services University of the Health Sciences in Bethesda, Maryland and the University of Miami School of Medicine in Miami, Florida. (Ex. 18, p. 2.) He also served as a staff physician and chief for the Miami VA Medical Center's Spinal Cord Injury Service. (*Id.*) Currently, Dr. Martinez-Arizala serves as the Director of the Spine Division and as a Professor of Clinical Neurology at the University of Miami School of Medicine. (*Id.*; Tr. 34.) He is board certified in neurology and is a board diplomate of the National Board of Medical Examiners. (Ex. 18, pp.1-2.) Dr. Martinez-Arizala has published over 30 peer-reviewed journal articles and exhibitions in neurology, with a research focus of spinal cord injuries. (*Id.* at 3-6; Tr. 34.) He has also published several books and abstracts on neurology and spinal cord injuries. (Ex. 18, pp. 3, 6-8.)

Petitioner filed two expert reports written by Dr. Martinez.  (Exs. 17, 33.)  Additionally, Dr. Martinez-Arizala testified at the entitlement hearing (Tr. 32-87) wherein he was presented without objection as an expert in clinical neurology (*Id.* at 36).

Dr. Martinez-Arizala opined that the influenza vaccine administered on October 3, 2016, caused petitioner's post-vaccination small fiber neuropathy.  (Ex. 17, p. 1; Tr. 37-38, 59-60.)  Dr. Martinez-Arizala noted that "[t]he onset of the neuropathy symptoms and the progression over the following weeks was within the expected time interval when related to the vaccine."  (Ex. 17, pp. 4, 6; Tr. 37-38.)  Specifically, Dr. Martinez-Arizala observed that petitioner's neurological symptoms began 10 to 12 days post influenza vaccine and progressed for several weeks afterwards.  (Ex. 17, pp. 2, 7.)  He emphasized that the physicians and healthcare providers who evaluated petitioner all noted that his symptoms began after the influenza vaccine and progressed for weeks following his vaccination, and the occurrence and progression of these symptoms are well-documented within contemporaneous medical records.  (*Id.* at 4, 6.)  Furthermore, Dr. Martinez-Arizala stressed that there is no evidence within the medical record that petitioner suffered from any neurological disorders or conditions prior to receiving the influenza vaccine at issue.  (*Id.* at 2, 6.)

With regard to diagnosis, Dr. Martinez-Arizala stressed that petitioner's treating physicians, including neurologists Dr. Weiss, Dr. Sandroni, Dr. Atkinson, and Dr. Zerofsky, all concurred with petitioner's diagnosis of post flu vaccine autoimmune peripheral neuropathy.  (Ex. 17, pp. 4-5.)  Furthermore, Dr. Martinez-Arizala emphasized that petitioner underwent comprehensive imaging and laboratory testing that revealed no other etiologies for his neuropathy.  (*Id.* at 4; Tr. 47, 58-59.)  He noted that this comprehensive testing ruled out the common causes of peripheral neuropathies.  (Ex. 17, p. 5; Tr. 39-41.)  Instead, Dr. Martinez-Arizala opined that petitioner's presentation and progression of symptoms are more consistent with a diagnosis of small fiber neuropathy ("SFN").  (Ex. 17, p. 5; Tr. 36-39.)  He agreed that it is not uncommon for SFN to be idiopathic.  (Tr. 62.)

According to Dr. Martinez-Arizala, typical symptoms of small fiber neuropathy include "distal burning, pain, numbness, as well as paresthesia and autonomic dysfunction" and how petitioner's "presentation fit these criteria."  (Ex. 33, p. 1; Tr. 36-38, 43-44.)  Consistent with this, Dr. Martinez-Arizala noted that petitioner began experiencing a hot burning sensation in the bottom of his feet approximately 10 to 12 days after receiving his influenza vaccine on October 3, 2016.  (Ex. 33, p. 1.)  He also stressed additional symptoms experienced by petitioner and documented in contemporaneous medical records including tingling in the tops of his feet, tops of his hands, cheeks, and ankles and a burning sensation in his toes and feet that eventually traveled to his hands.  (*Id.*; Tr. 37-38.)  While he agreed that many of petitioner's symptoms were nonspecific, he argues that this alone does not exclude SFN as a possible diagnosis.  (Ex. 33, p. 2.)  In addition, Dr. Martinez-Arizala noted that the autonomic testing petitioner underwent at the Mayo Clinic "showed mild cardiovagal impairment suggesting limited autonomic neuropathy."  (*Id.* at 1.)  He argues that this finding of autonomic dysfunction supports a differential diagnosis of SFN.  (Tr. 41, 43-

18

44, 52.)  Additionally, Dr. Martinez-Arizala noted that petitioner underwent several EMG nerve conduction studies which were all normal, a finding that is not uncommon for patients with small fiber neuropathy.  (Ex. 33, pp. 1-2; Tr. 40.)  In sum, Dr. Martinez-Arizala opined that these symptoms and examination findings are compatible with a diagnosis of SFN.  (Ex. 33, p. 1.)

Dr. Martinez-Arizala discussed the diagnostic criteria for SFN outlined in Devigili et al.  (Tr. 62-76 (discussing Grazia Devigili et al., *The Diagnostic Criteria for Small Fibre Neuropathy: From Symptoms to Neuropathology*, 131 BRAIN 1912 (2008) (Ex. 20; *see also* Ex. 34)).)  He opined that the first inclusionary criteria of clinical signs of small fiber impairment is satisfied in this case because petitioner had objective findings of sensory dysfunction during two examinations.  (Ex. 33, p. 1; Tr. 65.)  Specifically, Dr. Martinez-Arizala notes that documentation of two physical examinations performed in November of 2016 demonstrates that petitioner had "non-intact testing to sharp versus dull in his feet" and that petitioner felt "less sharp at index fingertips and undersurface of great toes bilaterally."  (Ex. 33, p. 1; Tr. 65-66.)  However, he agreed that the second and third inclusionary criteria are not satisfied in this case because petitioner's QST and skin biopsy were both normal.  (Tr. 66-67.)  Dr. Martinez-Arizala disagreed that that these criteria must be met to render a diagnosis of SFN, stressing that although "valuable," the criteria "are not definite."  (*Id.* at 70-71, 85.)  However, he ultimately agreed that "generally, yes, you like to see those" criteria when making a diagnosis of SFN.  (*Id.* at 64.)

Although petitioner's QST and skin biopsy results were negative, Dr. Martinez-Arizala stressed that these tests are not always positive in patients with SFN.  (Ex. 33, p. 1; Tr. 41, 47, 53.)  While maintaining that SFN can be difficult to diagnose, he conceded that a skin biopsy is more sensitive than the clinical examination and the test usually relied on to support a diagnosis of SFN.  (Ex. 17, p. 5 (citing Devigili et al., *supra*, at Ex. 20); Tr. 41.)  Dr. Martinez-Arizala relies on a paper by Devigili et al., which reported that skin biopsy showed a diagnostic efficiency of 88.4% in 67 patients examined with pure SFN to demonstrate that a skin biopsy test is not necessarily always positive in individuals with SFN.  (Ex. 33, p. 1 (citing Devigili et al., *supra*, at Ex. 20); Tr. 47-48.)  In addition, Dr. Martinez pointed to an article filed by respondent as demonstrating that there is an 10% false negative rate for skin biopsies relative to SFN, which he contends supports a diagnosis of SFN in this case.  (Tr. 52-53 (discussing David S. Saperstein, *Small Fiber Neuropathy*, 38 NEUROLOGIC CLINICS 607 (2020) (Ex. A, Tab 3)).)  Accordingly, he opined that it was reasonable for petitioner's treating physicians to reach a clinical diagnosis of small fiber neuropathy even though petitioner's condition was not entirely consistent with the generally used diagnostic criteria.  (Tr. 47-48.)

Dr. Martinez's opinion that the influenza vaccine caused petitioner's small fiber neuropathy rests on the theory of molecular mimicry.  (Ex. 17, p. 5; Tr. 49-51.)  Dr. Martinez-Arizala observed that

19

> [t]he development of an autoimmune disorder that affects the nervous system after vaccination is based on the concept of molecular mimicry, where components of the vaccine possess sequence similarities between it and specific human proteins that results in the cross-activation of autoreactive T or B cells.  This immune cross reactivity causes a reaction of the immune system against the pathogenic antigens that may harm the similar human proteins, essentially causing autoimmune disease.

(Ex. 17, p. 5 (citing David C. Wraith et al., *Vaccination and Autoimmune Disease: What Is the Evidence?*, 362 LANCET 1659 (2003) (Ex. 21); Yahel Segal & Yehuda Shoenfeld, *Vaccine-Induced Autoimmunity: The Role of Molecular Mimicry and Immune Crossreaction*, 15 CELLULAR & MOLECULAR IMMUNOLOGY 586 (2018) (Ex. 22); Javaraiah Srinivasappa et al., *Molecular Mimicry: Frequency of Reactivity of Monoclonal Antiviral Antibodies with Normal Tissues*, 57 J. VIROLOGY 397 (1986) (Ex. 23)).)  He contends that "[a]lthough molecular mimicry has been challenged, it remains a reputable and widely accepted theory in the scientific community."  (Ex. 33, p. 2.)  However, he deferred to Dr. Gershwin regarding the details of molecular mimicry.  (Tr. 81.)

To support his opinion that the flu vaccine caused petitioner's small fiber neuropathy, Dr. Martinez-Arizala cited references regarding the increased incidence of Guillain Barré syndrome ("GBS") after mass swine flu vaccination in 1976 as evidence of a causal relationship between vaccines and peripheral neuropathies.  (Ex. 17, pp. 5-6 (citing Wraith et al., *supra*, at Ex. 21; Segal & Shoenfeld, *supra*, at Ex. 22); Ex. 33, pp. 2-3; Tr. 54.)  Specifically, Dr. Martinez-Arizala noted that a 4-to-8 fold increased risk for developing GBS can be attributed to the swine flu vaccine.  (Ex. 17, p. 5 (citing Wraith et al., *supra*, at Ex. 21; Segal & Shoenfeld, *supra*, at Ex. 22).)  He explained that medical literature reviewing the relationship between the1976 swine flu vaccine and an increased incidence of GBS found that "attack rates of GBS among adults were higher in vaccinees compared with the rates in the unvaccinated population" and that "the distribution of cases occurring by week after vaccination clustered in the first 5 weeks, particularly in weeks 2 and 3."  (*Id.* at 6 (citing James J. Sejvar et al., *Guillain-Barré Syndrome Following Influenza Vaccination: Causal or Coincidental?*, 13 CURRENT INFECTIOUS DISEASE RPTS. 327 (2011) (Ex. 26)).)  Furthermore, Dr. Martinez-Arizala cited to a study by Martín Arias et al., which concluded that an association between GBS and the flu vaccine existed, and that molecular mimicry was hypothesized to be causal mechanism.  (Ex. 33, p. 3 (citing L.H. Martín Arias et al., *Guillain-Barré Syndrome and Influenza Vaccines: A Meta-Analysis*, 33 VACCINE 3773 (2015) (ECF No. 51-9[6])).)  Moreover, Dr. Martinez-Arizala discussed a study completed 30 years after the 1976 swine flu epidemic demonstrating that mice immunized with the swine flu vaccine developed anti-GM1 antibodies.  (Ex. 17, p. 5 (citing Irving Nachamkin et al., *Anti-Ganglioside Antibody Induction by Swine (A/NJ/1976/H1N1) and Other Influenza Vaccines: Insights into Vaccine-Associated Guillain-Barré Syndrome*, 198 J. INFECTIOUS DISEASES 226 (2008) (Ex. 27)).)  Thus, Dr. Martinez-Arizala concluded that this study

---

[6] Petitioner's exhibit list indicates that the article by Martín Arias et al. was filed as Exhibit 42.  (*See* ECF No. 92.)  However, this article was not properly bates stamped as Exhibit 42.  Therefore, for the purposes of this decision, I will refer to this article by its ECF pagination.

supports his hypothesis that molecular mimicry was the link between petitioner's influenza vaccine and his small fiber neuropathy.  (*Id.* at 5-6.)  He noted that "a SFN variant of the GBS has been reported."  (Ex. 33, p. 2 (citing Nobuhiro Yuki et al., *Acute Painful Autoimmune Neuropathy: A Variant of Guillain-Barré Syndrome*, 57 MUSCLE & NERVE 320 (2018) (Ex. 36)).)

Dr. Martinez-Arizala acknowledged that the data linking small fiber neuropathy to vaccines is limited.  (Ex. 33, p. 2.)  However, he cited several case reports of post-vaccination inflammatory neuropathies.  (Ex. 17, p. 6 (citing J.H.K. Hull et al., *Severe Vasculitis Neuropathy Following Influenza Vaccination*, 75 J. NEUROLOGY NEUROSURGERY & PSYCHIATRY 1507 (2004) (Ex. 27); Claude Vital et al., *Postvaccinal Inflammatory Neuropathy: Peripheral Nerve Biopsy in 3 Cases*, 7. J. PERIPHERAL NERVOUS SYSTEM 163 (2002) (Ex. 28); Paulo J. Lorenzoni et al., *Vasculitis Neuropathy Following Influenza Seasonal Vaccination*, 70 ARQUIVOS DE NEURO-PSIQUIATRIA 154 (2012) (Ex. 29); Jafar Kafaie et al., *Small Fiber Neuropathy Following Vaccination*, 18 J. CLINICAL NEUROMUSCULAR DISEASE 37 (2016) (Ex. 30); Nizar Souayah et al., *Small Fiber Neuropathy Following Vaccination for Rabies Varicella or Lyme Disease*, 27 Vaccine 7322 (2009) (Ex. 31); Ex. 33, p. 2 (citing Waqar Waheed et al., *Post COVID-19 Vaccine Small Fiber Neuropathy*, 64 MUSCLE & NERVE E1 (2021) (Ex. 37)); Tr. 54-55.)  For example, he cited cases reports of vasculitic neuropathy following the flu vaccine.  (Ex. 17, p. 6 (citing Hull et al., *supra*, at Ex. 27; Lorenzoni et al., *supra*, at Ex. 29); Tr. 53-54.)  Additionally, Dr. Martinez-Arizala cited a case report describing SFN following administration of the human papillomavirus virus ("HPV") vaccine, which noted a case in the literature of a patient who reported an onset of generalized dysesthesia ten to twelve days after receipt of the flu vaccine, suggesting a possible causal association.  (Ex. 17, p. 6 (citing Kafaie et al., *supra*, at Ex. 30); Ex. 33, p. 2; Tr. 55.)  Moreover, he cited another paper that reported cases of skin-biopsy confirmed small fiber neuropathy following vaccinations for rabies, varicella zoster virus, and Lyme disease.  (Ex. 17, p. 6 (citing Souayah et al., *supra*, at Ex. 31).)  Dr. Martinez-Arizala opined that the timing of petitioner's symptoms fits perfectly with what has been reported in the medical literature.  (Tr. 56-57.)

While he acknowledges that petitioner had a history of anxiety and that there was a notation in the record indicating petitioner was previously diagnosed with fibromyalgia, Dr. Martinez-Arizala disagrees with respondent's suggestion that these preexisting conditions caused petitioner's symptoms and overall clinical presentation.  (Ex. 33, p. 2; Tr. 44-45.)  He opined that petitioner's nerve pain and sensory changes, including the burning sensations in various parts of his body, clearly constitute new symptoms that occurred after vaccination.  (Ex. 33, p. 2.)  Additionally, he contends that anxiety is "very nonspecific" and would not lead to the type of symptoms petitioner experienced.  (Tr. 44.)  Moreover, he argues that petitioner's treating physicians did not interpret his numbness, tingling, and burning sensations as manifestations of anxiety.  (*Id.*)  With respect to fibromyalgia, Dr. Martinez-Arizala questions whether petitioner even has the condition and also opined that petitioner's clinical picture did not fit fibromyalgia.  (*Id.* at 45.)  He stated that fibromyalgia typically involves points of musculoskeletal tenderness in the joints, which was not observed in this case.  (*Id.*)

21

In sum, Dr. Martinez-Arizala opined that the weight of the evidence implicates the flu vaccine administered on October 3, 2016 as the cause of petitioner's autoimmune peripheral neuropathy.  (Ex. 17, p. 7; Ex. 33, p. 4; Tr. 36-38, 59-60.)  Given petitioner's clinical presentation and the thorough workup that eliminated other causes of his peripheral neuropathy, Dr. Martinez-Arizala maintains that the flu vaccine is the most likely cause in this case.  (Tr. 41, 58-59.)

### b.  Petitioner's Expert Immunologist, M. Eric Gershwin, M.D.[7]

Petitioner filed two expert reports authored by Dr. Gershwin.[8]  (Exs. 57, 59.)  Dr. Gershwin also provided expert testimony at the entitlement hearing.  (Tr. 87-131, 214-221.)  He was proffered without objection as an expert in immunology.  (*Id.* at 91.)

With respect to diagnosis, Dr. Gershwin deferred to Dr. Martinez-Arizala for the diagnosis of peripheral neuropathy and the kinetics of when the symptoms began.  (Ex. 57, p. 2; Tr. 95.)  Dr. Gershwin agreed that the medical records reflect that petitioner had a preexisting diagnosis of fibromyalgia.  (Tr. 94.)  He explained that fibromyalgia is a central pain disease that involves widespread pain and discomfort as opposed to localized pain and discomfort.  (*Id.* at 95.)  Dr. Gershwin described petitioner as "a poster child for fibromyalgia."  (*Id.* at 217.)  He testified that petitioner has "the stress of his family, issues of abuse earlier in life, [and] current stress.  He has a dry mouth.  He's got irritable bowel.  He's got the anxiety.  He's got the history of generalized pain.  That is fibromyalgia."  (*Id.*)  However, Dr. Gershwin opined that acute pain in the feet is not a symptom consistent with fibromyalgia.  (*Id.* at 217-18.)  While he testified that diagnoses of fibromyalgia and autoimmune peripheral neuropathy can coexist, Dr. Gershwin stated that the medical consensus would be that the two conditions are unrelated.  (*Id.* at 95,

---

[7] Dr. Gershwin received his bachelor's degree from Syracuse University in 1966 and his medical degree from Stanford University in 1971.  (Ex. 58, p. 1.)  From 1971 to 1973, Dr. Gershwin completed his internship and residency in internal medicine at Tufts New England Medical Center in Boston, Massachusetts.  (*Id.* at 2.)  In 1975, he completed his fellowship in immunology and rheumatology at the National Institutes of Health in Bethesda, Maryland.  (*Id.*)  Since completing his fellowship, Dr. Gershwin has held various academic appointments within the Division of Rheumatology, Allergy, and Clinical Immunology at the University of California Davis School of Medicine.  (*Id.*; Tr. 88.)  Currently, he serves as a distinguished professor of medicine and Chief of the Division of Rheumatology, Allergy, and Clinical Immunology at the University of California Davis School of Medicine.  (Ex. 58, p. 2; Tr. 88-89.)  Dr. Gershwin is board certified in internal medicine, rheumatology, and allergy and clinical immunology.  (Ex. 58, p. 2.)  He maintains a license to practice medicine in California.  (*Id.*)  Dr. Gershwin has held various editorial positions on several medical journals.  (*Id.* at 5-6.)  He has published over 70 books and monographs, over 100 book chapters, and more than 1,000 peer-reviewed articles the majority of which focus on various immunological topics.  (*Id.* at 9-114; Tr. 90.)  Dr. Gershwin's research interests include the etiology of autoimmune disease and how to restore tolerance in an individual with serious immune dysfunction.  (Tr. 89.)

[8] Dr. Gershwin's second report marked as Exhibit 59 is primarily a series of direct quotes from various articles of medical literature filed in support of his opinion.  (*See* Ex. 59.)  The undersigned has reviewed these direct quotes and the literature filed in association with his report.  However, I find that it is not necessary to summarize these direct quotes in outlining Dr. Gershwin's expert opinion in this case.

217.)  Further, he opined that none of petitioner's preexisting conditions would account for his autoimmune peripheral neuropathy.  (*Id.* at 96.)

Dr. Gershwin endorsed Dr. Martinez-Arizala's reliance on molecular mimicry to explain how petitioner developed a post-vaccination autoimmune peripheral neuropathy.  (Ex. 57, pp. 2-3, 15; Tr. 96-97.)  He noted that autoimmune disorders are defined by a loss of tolerance to an antigen and involve genetic susceptibility and environmental stimulation.  (Ex. 57, p. 4; Tr. 96, 104-05.)  He opined that molecular mimicry is an acceptable thesis of autoimmunity.  (Tr. 104.)

After providing background information on the immune tolerance and molecular mimicry and discussing the immune response to vaccination (Ex. 57, pp. 3-8), Dr. Gershwin explained that

> Currently, there are four major criteria that are reasoned to account for molecular mimicry: 1) "similarity between a host epitope and an epitope of a microorganism or environmental agent," 2) "detection of antibodies or T-cells that cross-react with both epitopes in patients with AD," 3) "epidemiological link between exposure to the environmental agent or microbe and development of AD," and 4) "re-producibility of autoimmunity in an animal model following sensitization with the appropriate epitopes either following infection with the microbe or exposure to the environmental agent."

(*Id.* at 8 (quoting Manuel Rojas et al., *Molecular Mimicry and Autoimmunity*, 95 J. AUTOIMMUNITY 100 (2018) (Ex. 62)).)  Despite raising these criteria, Dr. Gershwin stressed that "they are challenging to demonstrate in humans for several reasons."  (*Id.*)  Thus, during the hearing, Dr. Gershwin testified that he believes molecular mimicry can be implicated in this case despite none of these criteria being satisfied.  (Tr. 97-98, 106-09.)  In particular, he confirmed during the hearing that he has not identified a specific mimic.[9]  (Tr. 123.)  In response to Dr. He's criticism that he has not identified the epitope that is cross-reactive in this case, Dr. Gershwin explained that identifying the specific antigen involved is difficult and noted that requiring satisfaction of all the Rojas et al. criteria is unrealistic.  (*Id.* at 99-100, 103, 106-09.)  While it is "a good first step," Dr. Gershwin agreed that homology or structural similarity alone is not enough to support a finding that molecular mimicry caused an autoimmune disease.  (*Id.* at 124-25.)

---

[9] Dr. Gershwin devoted significant attention to seeking to refute the notion that molecular mimicry should not be limited to "simple linear homology," explaining instead that molecular mimicry occurs in three dimensions.  (Ex. 57, pp. 12-13.)  Dr. Gershwin engaged in this discussion in response to respondent's expert, Dr. He, suggesting that "Dr. He would seem to require that there be a linear homology between a component of the vaccine and a neural antigen.  If indeed Dr. He is wedded to linear sequence homologies, then he is also wedded to 75-year-old technology and simultaneously ignores the concept of secondary and tertiary structure."  (*Id.* at 3.)  However, it is not necessary to delve into the details of what homologies may be possible where Dr. Gershwin has not actually identified any specific homology as being at issue.

23

When asked what evidence supports a finding that petitioner had a genetic predisposition to SFN, Dr. Gershwin testified that he is basing his conclusion that petitioner had a genetic susceptibility to autoimmune disease "on the fact that he has an autoimmune disease, and the overwhelming science for decades is that autoimmune disease requires genetic predispositions." (Tr. 125-27.)  However, Dr. Gershwin agreed that there is no evidence in the medical records suggesting that petitioner had a preexisting history or a family history of autoimmune disease.  (*Id.* at 126-27.)

Dr. Gershwin opined that molecular mimicry is a likely mechanism of autoimmunity in this case because of the example of GBS.  (Ex. 57, p. 11; Tr. 99-103, 120-21.)  In particular, GBS represents an example of an environmentally triggered autoimmune reaction in which autoantibodies cross-react against gangliosides within the peripheral nerves.  (Ex. 57, p. 11.)  Dr. Gershwin explained that gangliosides have considerable heterogeneity with hundreds of different variations and are found throughout the peripheral nerves.  (*Id.*; Ex. 59, p. 2; Tr. 98, 214-15.)  Citing a paper by Alaedini et al., Dr. Gershwin suggested that gangliosides have been implicated as a cause of neuropathic pain in small fiber neuropathy.  (Ex. 59, p. 3; Tr. 98-99, 103, 215-16 (citing Armin Alaedini et al., *Antiganglioside Autoantibodies in Multifocal Acquired Sensory and Motor Neuropathy*, 60 ARCHIVES NEUROLOGY 42 (2003) (Ex. 92)).)  However, he acknowledged that petitioner was not diagnosed with the specific neuropathy examined by Alaedini et al.  (Tr. 220-21.)

During the hearing, Dr. Gershwin further clarified that he used gangliosides in his reports as an example of a promiscuous antigen that can lead to neurologic injury in GBS.  (Tr. 98-99, 123, 214-16, 220.)  Additionally, given the hundreds of variations of gangliosides, Dr. Gershwin confirmed that not all gangliosides are the same.  (*Id.* at 103; Ex. 59, p. 2.)  In his first report, he stated that the location of gangliosides varies anatomically, and that the location and density of a given ganglioside may be different in different neurologic fibers.  (Ex. 57, p. 11.)  Further, he testified that ganglioside diversity likely explains the different etiologies of GBS.  (Tr. 103.)  Dr. Gershwin testified that the paper by Alaedini et al. demonstrates that gangliosides go far beyond GBS.  (*Id.* at 221 (discussing Alaedini et al., *supra*, at Ex. 92).)

Dr. Gershwin disagreed with Dr. Callaghan and Dr. He's suggestion that his discussion of GBS is irrelevant because it is a different disease from SFN.  (Tr. 220.)  He argues that it is relevant "just on the basis of the principle of immune tolerance.  It's relevant just by the multiple number of environmental agents that can induce it, and it's also relevant because of the antigens involved."  (*Id.*)  Additionally, he stressed that the flu vaccine can cause GBS, which is supported by the medical literature and the fact that GBS is listed as a Table Injury with respect to the flu vaccine.  (Tr. 110.)  When asked whether he agreed that all vaccines can cause SFN, Dr. Gershwin testified that he would need more information before he could agree with that conclusion.  (*Id.* at 120-21.)  However, he argues that the flu vaccine can cause SFN due to the flu vaccine's "incrimination with GBS."  (*Id.* at 120.)

24

Although he recognized that a temporal association alone is not proof of causation, Dr. Gershwin opined that an abnormal immune response that occurs within six weeks of vaccination would be supportive of vaccine-causation. (Tr. 113-14, 129; Ex. 57, p. 12.) Moreover, he emphasized that there is no evidence that petitioner experienced a viral or bacterial infection occurring around the same time as his flu vaccine at issue that could otherwise explain an abnormal immune response. (Tr. 114.) In this case, petitioner symptoms began approximately ten days after the flu vaccine, which is within the expected timeframe of an adaptive immune response. (*Id.* at 114-15; Ex. 57, p. 12.) Therefore, Dr. Gershwin maintained that the onset of petitioner's symptoms occurred within the timeframe within which he would expect a molecular mimicry response. (Tr. 114-15, 129; Ex. 57, p. 12.) He also noted that the timing in this case is consistent with what you would expect for an immunoglobulin class switch to take place. (Tr. 115-16, 129.)

### c. Respondent's Expert Neurologist, Brian C. Callaghan, M.D., M.S.[10]

Respondent submitted one expert report authored by Dr. Callaghan. (Ex. C.) Dr. Callaghan also offered expert testimony at the entitlement hearing. (Tr. 132-186.) He was proffered without objection as an expert in neurology. (*Id.* at 135.)

Dr. Callaghan disagrees with a diagnosis of SFN in this case. (Ex. C, p. 7; Tr. 136, 151.) First, he stresses that petitioner does not satisfy the diagnostic criteria for SFN. (Ex. C, p. 7; Tr. 137-51.) Dr. Callaghan cited a paper by Devigili et al., which outlines the inclusionary and exclusionary criteria for a diagnosis of SFN.[11] (Ex. C, p. 7 (citing Grazia Devigili et al., *Diagnostic Criteria for Small Fibre Neuropathy in Clinical Practice and Research*, 42 BRAIN 3728 (2019) (Ex. C, Tab 1)).) In explaining his

---

[10] Dr. Callaghan received his bachelor's degree from the University of Michigan in 1999 and his medical degree from the University of Pennsylvania Medical Center in 2004. (Ex. D, p. 1.) He also earned a master's degree in clinical research design and statistical analysis from the University of Michigan. (*Id.*) Dr. Callaghan completed his internship in 2005 and his neurology residency in 2008 at the University of Pennsylvania Medical Center in Philadelphia. (*Id.*) He then went on to complete a neuromuscular fellowship at the University of Michigan Health System in Ann Arbor, Michigan in 2009. (*Id.*) Additionally, Dr. Callaghan completed a health policy fellowship at the University of Michigan's Center for Healthcare Research and Transformation in 2016. (*Id.*; Tr. 133.) After completing his neuromuscular fellowship, Dr. Callaghan has held numerous academic appointments, with professorships in neurology at the University of Michigan Health System, the University of Michigan Medical School, and the VA Ann Arbor Healthcare System. (Ex. D, p. 1.) Currently, Dr. Callaghan serves as a professor of neurology for the University of Michigan Health System and the University of Michigan Medical School. (Tr. 132.) He also currently serves as a staff physician for the VA Ann Arbor Health System's Department of Neurology. (Ex. D, p. 1.) Additionally, Dr. Callaghan currently holds an administrative appointment as the co-director of the Neuromuscular Division and associate program director for the neurology residency program at the University of Michigan Health System. (*Id.* at 2; Tr. 135.) Dr. Callaghan is board certified in neurology and maintains his medical license in Michigan. (Ex. D, p. 1.) He has published over 100 peer-reviewed articles on various neurological topics, including neuropathy. (*Id.* at 12-18.)

[11] Although Dr. Martinez-Arizala and Dr. Callaghan did not cite to the same version of Devigili et al. (*compare* Ex. 20, *with* Ex. C, Tab 1), both experts agree that the articles outline the same diagnostic criteria for SFN. (Tr. 62-63, 137-38.)

reliance on this article, he maintained that the Devigili et al. criteria are the most widely used criteria in the field of neurology for diagnosing SFN.  (Tr. 137.)

The inclusion criteria for a diagnosis of small fiber neuropathy include: (1) clinical signs of small fiber impairment (pinprick and thermal sensory loss and/or allodynia[12] and/or hyperalgesia[13]), with a distribution consistent with peripheral neuropathy (length or non-length dependent neuropathy); (2) abnormal warm and/or cooling threshold at the foot assessed by QST; and (3) reduced IENF density at the distal leg.  (Ex. C, p. 7 (citing Devigili et al., *supra*, at Ex. C, Tab 1).)  According to Devigili et al., at least two of the three inclusionary criteria must be met in order to support a diagnosis of SFN.  (Tr. 138-39 (discussing Devigili et al., *supra*, at Ex. C, Tab 1).)  Dr. Callaghan contends that none of the inclusionary criteria are satisfied in this case.  (*Id.* at 139-46; Ex. C, p. 7.)  When considering petitioner's medical record in its entirety, Dr. Callaghan opined that petitioner's physical examinations, particularly those performed by various neurologists, revealed no signs of small fiber impairment.  (Ex. C, p. 7; Tr. 139-41.)  Furthermore, Dr. Callaghan noted that petitioner underwent both quantitative sensory testing and a skin biopsy, which were both normal.  (Ex. C, p. 7; Tr. 141-44.)  He argues that petitioner's negative skin biopsy is of particular importance with respect to diagnosis in this case, as a skin biopsy is the "gold standard" and best confirmatory test for SFN.  (Tr. 144-45, 150, 182.)

Moreover, Dr. Callaghan stated that petitioner met one exclusionary criteria identified by Devigili et al.  (Ex. C, p. 7; Tr. 150.)  The exclusionary criteria include: (1) any sign of large fiber impairment (light touch and/or vibratory and/or proprioceptive sensory loss and/or absent deep tendon reflexes; (2) any sign of motor fiber impairment (muscle waste and/or muscle weakness); and (3) any abnormality on sensorimotor NCS.  (Ex. C, p. 7 (citing Devigili et al., *supra*, at Ex. C, Tab 1).)  In this case, Dr. Callaghan highlighted that petitioner had abnormal vibration documented on physical examination by two providers, one of which was a neurologist.  (Ex. C, p. 7; Tr. 148-50.)  Therefore, Dr. Callaghan opined that petitioner did not meet any of the inclusionary criteria and also met one of the exclusionary criteria,[14] which cuts against a finding that SFN is the most appropriate diagnosis in this case.  (Ex C., p. 7; *see also* Tr. 137-51.)

---

[12] Allodynia refers to pain that results from non-noxious stimuli to normal skin.  *Allodynia*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=1820 (last visited June 1, 2026).

[13] Hyperalgesia refers to an abnormally increased sensitivity to pain.  *Hyperalgesia*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=23666 (last visited June 1, 2026).

[14] Both parties' neurology experts quibble with some of the physical exam findings that include a subjective component.  On petitioner's behalf, Dr. Maritnez-Arizala opts not to credit the findings of abnormal vibration (Tr. 74-76), which Dr. Callaghan credits in finding the exclusionary criterion of evidence of large fiber neuropathy to have been met (*Id.* at 147-48).  Conversely, Dr. Callaghan questions the finding relative to sensory dysfunction (*Id.* at 139-41) that Dr. Martinez-Arizala had relied upon (*Id.* at 65-66; Ex. 33, p. 1).  However, in response to my questions during the hearing, Dr. Callaghan ultimately concluded, given the negative objective NCS/EMG findings, that the presence of a large fiber neuropathy was unlikely.  (Tr. 181-82.)

Dr. Callaghan disagreed with Dr. Martinez-Arizala's suggestion that petitioner's symptoms and clinical presentation alone are sufficient to support a diagnosis of SFN. (Tr. 145-46.)  He agrees with authors conclusion in Devigili et al. that sensory symptoms alone are not a reliable screening factor for SFN.  (*Id.* (discussing Devigili et al., *supra*, at Ex. C, Tab 1).)  If providers only considered a patient's symptoms, there would be a tendency to over-diagnose individuals with SFN.  (*Id.* at 146.)

Furthermore, Dr. Callaghan testified that this is not a case of isolated problems with numbness, tingling, and pain, which is often observed with neuropathy.  (Tr. 151.) In contrast, petitioner experienced dozens of symptoms and complaints, the vast majority of which cannot be explained by SFN.  (Ex. C, p. 7; Tr. 151.)  For example, he indicated that the following symptoms experienced by petitioner cannot be explained by a diagnosis of small fiber neuropathy:

> [S]ore and tired muscles, fatigue, esophagus on fire then awoke with chest tightness and burning, fatigued legs, sore triceps, feeling drugged, flushed face, no appetite, terrible concentration, cramping of the calves and thighs, back pain, burning in his anus, arms felt like they had weights on them, dyspnea, spinal cord vibrating, generalized weakness, numbness of his jaw, slow heart rate, nausea, feeling like he had a golf ball stuck in his throat, headache, burning in his testicles and tongue, thumb and forefinger vibrating, tailbone vibrating in pulses, unable to raise his voice, constant sniffling, sudden onset of pain between his shoulder blades, tight kneecaps and elbows, diffuse joint pains in his feet, hands, elbows, and knees that resolve with popping his joints, diffuse body pain, and inside of his legs and hands were vibrating.

(Ex. C, p. 7; Tr. 151-53.)  Ultimately, although petitioner did report an onset of new symptoms pain and sensory symptoms post-vaccination, these complaints were fluctuating and migratory, which is inconsistent with SFN.  (Ex. C, p. 7; Tr. 153-54, 165.) Therefore, they are better understood as an evolution of petitioner's overall symptomology.  (Tr. 153-54.)  If petitioner had been experiencing physiologic nerve damage related to small fiber neuropathy, his deficits would accumulate rather than fluctuate.  (*Id.* at 154.)

Based on his review of the medical records, Dr. Callaghan opined that petitioner's various symptoms and overall clinical presentation are likely secondary to petitioner's centralized pain conditions, anxiety and panic disorder, and multiple life stressors.  (Ex. C, p. 7; Tr. 154-58.)  He maintained that petitioner's diffuse pain and fluctuating and migratory course are commonly observed in patients with anxiety, life stressors, or centralized pain conditions.  (Tr. 154, 158-59, 161, 171-72, 184-85.)  Dr. Callaghan stressed that petitioner had preexisting centralized pain conditions, diagnosed as fibromyalgia, esophageal spasms, and irritable bowel syndrome.  (*Id.* at 155-58; Ex. C, p. 7.)  He explained that centralized pain conditions can cause pain that cannot be explained by physical examination findings or diagnostic testing, which is

27

thought to be due to abnormalities with pain processing in the brain. (Tr. 155-57.) Additionally, Dr. Callaghan discussed how petitioner's medical records reflect that petitioner suffered from longstanding anxiety and panic disorder, and that he was dealing with multiple life stressors throughout his clinical course. (*Id.* at 155-56; Ex. C, p. 7.) He highlighted that petitioner was diagnosed with adjustment disorder with anxious and depressed mood, and that other providers referenced or diagnosed petitioner with anxiety and stress-related conditions. (Ex. C, p. 7.) Numerous providers encouraged petitioner to undergo a behavioral health evaluation, and many of petitioner's symptoms improved with relaxation and clonazepam. (*Id.*; Tr. 158.) Petitioner himself even questioned at one point whether his anxiety was contributing to his symptoms. (Tr. 181.) Given all of this and also considering petitioner's extensive yet unremarkable workup that did not confirm a diagnosis of SFN, Dr. Callaghan contends that petitioner's pain and sensory symptoms were more likely due to his longstanding anxiety, life stressors, and centralized pain conditions. (Ex. C, p. 7; Tr. 154-58, 167-72, 184-85.)

While he acknowledged that Dr. Sandroni diagnosed petitioner with post-vaccine SFN and vaccine-induced neuritis, Dr. Callaghan disagrees with her assessment. (Tr. 159-60, 173-81.) Dr. Callaghan testified that it was not unreasonable for petitioner's treating providers to include SFN on the differential. (*Id.* at 172-73, 180.) However, he explained that just because a condition is considered in the differential diagnosis does not mean testing is necessarily warranted. (*Id.* at 172.) Additionally, Dr. Callaghan stressed that he had the benefit of viewing the entire medical record after the fact in determining that it is unlikely that petitioner has SFN, noting that it is very uncommon for treating providers to be aware of or have access to a patient's complete medical record. (*Id.* at 173.) Based on Dr. Sandroni's documentation, Dr. Callaghan testified that "I don't think she had an accurate representation of [petitioner's] history or exam. She didn't know about his, you know, premorbid anxiety, she didn't know about his centralized pain conditions, she didn't know about his life stressors." (*Id.* at 175.) Specifically, he highlighted that Dr. Sandroni only documented a medical history of sleep apnea, which is not accurate or reflective of what is documented throughout petitioner's medical records. (*Id.* at 176.)

Finally, Dr. Callaghan opined that, even if small fiber neuropathy were the correct diagnosis, there is no convincing evidence that suggests a potential causal link between the influenza vaccine and small fiber neuropathy. (Ex. C, p. 8.) Dr. Callaghan stated that Dr. Martinez-Arizala relied primarily upon case reports and case series which are anecdotal and provide low-level evidence compared to other study designs. (*Id.*) Thus, Dr. Callaghan finds the evidence offered by Dr. Martinez-Arizala only suggests a proximate temporal relationship between vaccination and small fiber neuropathy, which alone, is insufficient to demonstrate causation. (*Id.*) Critically, Dr. Callaghan noted that none of the case reports relied on by Dr. Martinez-Arizala specifically involve the influenza vaccine and small fiber neuropathy. (*Id.*) To the extent petitioner relies on analogy to GBS, Dr. Callaghan stresses that GBS and small fiber neuropathy are "incredibly different," involving different nerve fibers, different confirmatory tests, and

28

different treatments.  (Tr. 162.)  Knowing the cause of one would not be informative of the cause of the other.  (*Id*.)

### d.  Respondent's Expert Immunologist, You-Wen He, M.D., Ph.D.[15]

Respondent also submitted two expert reports written by Dr. He.  (Exs. A, E.)  Dr. He also provided expert testimony at the entitlement hearing.  (Tr. 186-213.)  He was proffered without objection as an expert in immunology.  (*Id.* at 190-91.)

Dr. He opined that there is no evidence linking the flu vaccine to SFN, stressing that a search for the influenza vaccine and SFN did not yield a single published study or case report.  (Ex. A, p. 3; Ex. E, p. 7; Tr. 192-93.)  Additionally, Dr. He cited several studies that he asserts have clearly concluded that there is no evidence supporting a causal relationship between the flu vaccine and SFN.[16]  (Ex. A, p. 3.)  Given the prevalence of SFN and the fact that hundreds of millions of individuals receive the flu vaccine each year, Dr. He stressed that he would expect to see case reports if there was a link between the flu vaccine and SFN.  (*Id.*; Tr. 192-94.)  Therefore, he contends that the complete lack of clinical reports of a possible association indicates that it "is highly unlikely" that the flu vaccine causes SFN.  (Ex. A, pp. 3, 7.; Ex. E, p. 7; Tr. 192-94.)

Dr. He also emphasized that none of the articles cited by Dr. Martinez-Arizala specifically involve the influenza vaccine and SFN.  (Ex. A, p. 7.)  In particular, he

---

[15] In 1986, Dr. He received his medical degree from The Fourth Military Medical University in Xian, China.  (Ex. B, p.1.)  He also earned a master's degree in microbiology in 1989 from the Institute of Microbiology and Epidemiology at the Academy of Military Medical Sciences in Beijing, China.  (*Id.*)  In 1996, Dr. He earned his Ph.D. in immunology from the University of Miami School of Medicine.  (*Id.*; Tr. 188.)  After completing his Ph.D., Dr. He served as a senior fellow at the Department of Immunology University of Washington Howard Hughes Medical Institute.  (Ex. B, p. 1; Tr. 187-88.)  Since completing his post-doc training, Dr. He has held various academic appointments at Duke University Medical Center's Department of Immunology.  (Ex. B, p.1.)  Currently, he serves as a tenured professor immunology at Duke University Medical Center and is the director for an advanced immunology course.  (Ex. A, p. 1; Ex. B, p. 1; Tr. 187.)  Dr. He has been conducting research in immunology since 1986 with areas of interest including innate and adaptive immunity against viral and bacterial infections as well as cancer immunotherapy.  (Ex. A, p.1; Tr. 189.)  Dr. He has published over 100 peer-reviewed articles on immunology and has also held editorial positions for several major biomedical journals.  (Ex. A, pp. 1-2; Ex. B, pp. 9-17; Tr. 189.)

[16] Specifically, he discusses a 2012 report by the Institute of Medicine ("IOM") Committee that found no epidemiologic or mechanistic evidence between the influenza vaccine and small fiber neuropathy.  (Ex. A, p. 3 (discussing INST. OF MED., *Evaluating Biological Mechanisms of Adverse Events: Molecular Mimicry*, in ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY 70-71 (Kathleen Stratton eds., 2012) [hereinafter 2012 IOM Report] (Ex. A, Tab 4)).)  The report states that "the epidemiologic evidence is insufficient or absent to assess an association between influenza vaccine and small fiber neuropathy."  (*Id.* (citing 2012 IOM Report, *supra*, at Ex. A Tab 4).)  Dr. He also highlights a 2014 study by the Agency for Healthcare Research and Quality that reported "SFN is not a disease associated with any vaccination."  (*Id.* (citing Agency for Healthcare Rsch. & Quality, Safety of Vaccines Used for Routine Immunization in the United States, at 1 (unpublished manuscript) (Ex. A, Tab 5)).)  Lastly, Dr. He notes a 2020 vaccine safety systemic review that concluded that "vaccines have not been shown to cause small fiber neuropathy."  (*Id.* (quoting Matthew Z. Dudley et al., *The State of Vaccine Safety Science: Systematic Review of the Evidence*, 20 LANCET INFECTIOUS DISEASES e80 (2020) (Ex. A, Tab 6, p. 6)).)

contends that the references cited Dr. Martinez-Arizala regarding an increased incidence of GBS after the 1976 swine flu vaccine have no bearing on this case as petitioner did not receive that specific vaccinee nor was he diagnosed with GBS.  (*Id.* at 6; *see also* Tr. 194-95, 205.)  Further, Dr. He indicated that there is no evidence that the gangliosides potentially implicated in molecular mimicry relative to GBS are relevant to SFN.  (Tr. 208.)

Dr. He also noted his disagreement with Dr. Martinez's opinion that the onset of petitioner's neurological symptoms supports his opinion that the influenza vaccine caused petitioner's small fiber neuropathy.  (Ex. A, p. 8.)  Dr. He argues that the fact that petitioner's neurological symptoms began around 10 to 12 days post vaccination only shows temporality and temporality alone is insufficient to establish a potential causal link between the influenza vaccine and small fiber neuropathy.  (*Id.*)  Given the lack of any other clinical evidence, Dr. He concludes that the influenza vaccine did not cause petitioner's small fiber neuropathy.  (*Id.* at 8-10.)

Additionally, Dr. He rejects petitioner's reliance on molecular mimicry, noting this theory has been strongly challenged by recent scientific evidence.  (Ex. A, pp. 4-6.)  He explained that the theory of molecular mimicry rests on two categories of scientific findings: (1) sequence homology between microbial pathogens and human proteins; and (2) self-reactive/cross-reactive lymphocytes and antibodies to self and foreign antigens.  (Ex. E, p. 2; Tr. 196.)  Large sequencing of proteomes has demonstrated massive peptide sharing between viral and human proteomes.  (Ex. A, p. 4; Ex. E, p. 2; Tr. 197.)  Specifically, Dr. He discusses a study by Kanduc et al. that examined 30 viral proteomes for amino acid sequence similarity to the human proteome.  (Ex. A, p. 4 (citing Darja Kanduc et al., *Massive Peptide Sharing Between Viral and Human Proteomes*, 29 PEPTIDES 1755 (2008) (Ex. A, Tab 7)).)  The study reported significant amino acid sequence similarity between the H5N1 influenza virus and human proteins.  (*Id.* at 4-5 (citing Kanduc et al., *supra*, at Ex. A, Tab 7.)  Given the results of this study and several other studies demonstrating similar results, Dr. He opined that "[t]hese massive sequence similarities would suggest a 100% autoimmune disease rate in the general population after either infection or vaccination according to the molecular mimicry theory, which is obviously not the case."  (*Id.* at 5.)  Therefore, Dr. He emphasized that linear or structural similarities between the human proteome and microbial pathogen alone is insufficient to cause autoimmune disease.  (Ex. E, p. 2.)

Furthermore, Dr. He maintained that the cross reactivity of lymphocytes between self-proteins and infectious agents is not uncommon.  (Ex. A, p. 5; Ex. E, pp. 3-4; Tr. 197-98.)  He explained that all T lymphocytes are self-reactive, and that the cross reactivity of T lymphocytes to self-antigens is an indefensible and fundamental feature of the human immune system.  (Ex. E, pp. 3-4; Tr. 197-98, 212.)  Therefore, he contends that homology and cross-reactivity alone are insufficient to explain how molecular mimicry causes autoimmune disease.  (Ex. E, p. 4; Tr. 198.)

Dr. He discussed an IOM Committee Report that identified three essential criteria for the molecular mimicry theory to be operative in a clinical case of autoimmune

30

disease.  (Ex. A, p. 5 (citing INST. OF MED., *Evaluating Biological Mechanisms of Adverse Events: Molecular Mimicry*, *in* ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY 70-71 (Kathleen Stratton eds., 2012) [hereinafter 2012 IOM Report] (Ex. A, Tab 4)).)  Those three criteria include: (1) a susceptible host whose genetic background and adaptive immune responses allow emergence of self-reactive immunity; (2) exposure to an exogenous agent that expresses antigens immunologically similar to self-antigen(s); and (3) a host immune response to the exogenous agent that cross reacts with biologically relevant host tissue structures and causes tissue damage and clinical disease.  (*Id.* (citing 2012 IOM Report, *supra*, at Ex. A, Tab 4).)  Dr. He opined that petitioner's case fails to meet any of the three essential criteria.  (*Id.* at 6.)  Dr. He also stresses that this IOM Committee Report concluded that amino acid sequence similarity alone is insufficient to prove that molecular mimicry is the pathogenic mechanism for a disease.  (*Id.* at 5.)

While he acknowledged that Dr. Gershwin expanded upon his theory of molecular mimicry in his second report, Dr He argues that Dr. Gershwin's opinion still falls short of demonstrating a causal link between the flu vaccine and petitioner's SFN. (Ex. E, pp. 4-6.)  He agreed that environmental and genetic factors can play an important role in autoimmune disease.  (*Id.* at 2.)  However, Dr. He stressed that both factors have long been considered potential risk factors for the development of autoimmune disease irrespective of molecular mimicry.  (*Id.*)

During the hearing, Dr. He further reiterated that homologies are not rare phenomenon, that cross-reactivity is a natural part of the human immune system, and that the immune system includes counter-effect elements for every effector element. (Tr. 196-98.)  Thus, it requires a "perfect storm" for a stimulus to break immune tolerance and result in autoimmune disease via molecular mimicry, which is why most people do not develop autoimmunity.  (*Id.*)  Therefore, he contends that the critical determinant of autoimmune development upon antigen stimulation is the strength and extent of the immune activation induced by the overall immunological encounter, not the molecular mimicry between self-proteins and foreign antigens.  (Ex. E, pp. 4-5.) Moreover, Dr. He urged that the immune response to vaccination cannot be equated to an infection in its capacity to break tolerance and result in autoimmunity.  (Tr. 201-05.) Therefore, Dr. He contends that even if molecular mimicry is a credible theory, the evidence on the record fails to support the conclusion that molecular mimicry caused petitioner's small fiber neuropathy.  (Ex. A, p. 6.)

## V.    Analysis

### a.  *Althen* prong one

Under *Althen* prong one, petitioner must provide a "reputable medical theory," showing that the subject vaccine can cause the type of injury alleged.  *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d

31

1352 (Fed. Cir. 2006)).  Such a theory need only be "legally probable, not medically or scientifically certain."  *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994).  Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory.  *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)).  However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [the proposed causal] theory.  While it does not require medical or scientific certainty, it must still be 'sound and reliable.'"  *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (first quoting *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); then quoting *Knudsen*, 35 F.3d at 548-49). That is, although petitioners are not required to prove their theories in any one way, they must in all events support their proffered theory with sound and reliable scientific explanation, *Boatmon*, 941 F.3d at 1359, and provide evidence that establishes on balance that the vaccine at issue can more likely than not cause the injury at issue, *Cerrone v. Sec'y of Health & Human Servs.*, 146 F.4th 1113, 1120-23 (Fed. Cir. 2025).

In this case, petitioner contends that "[t]he medical theory of molecular mimicry provides a compelling explanation for how the influenza vaccine caused [his] SFN." (ECF No. 97, p. 8.)  He stresses: "[a]s this Court has ruled for decades, molecular mimicry is a well-accepted theory in vaccine cases, particularly in Guillain-Barré Syndrome (GBS), an autoimmune neuropathy caused by vaccines through this same process."  (ECF No. 103, p. 3.)  Petitioner is correct that molecular mimicry is "a generally accepted scientific principle," but "mere invocation of the scientific term does not carry a petitioner's burden in a Program case."  *Deshler v. Sec'y of Health & Human Servs.*, No. 16-1070V, 2020 WL 4593162, at *20 (Fed. Cl. Spec. Mstr. July 1, 2020) (citing *Forrest v. Sec'y of Health & Human Servs.*, No. 14-1046V, 2019 WL 925495, at *3 (Fed. Cl. Spec. Mstr. Jan. 28, 2019)).  Afterall, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness."  *Moberly*, 592 F.3d at 1324.

Petitioner's neurology expert, Dr. Martinez-Arizala, invoked molecular mimicry as a likely explanation as to how a vaccine can cause a peripheral neuropathy (Ex. 17, pp. 5-6; Tr. 50-51, 54); however, he deferred to petitioner's immunology expert, Dr. Gershwin, on the details of molecular mimicry (Tr. 81).  Dr. Gershwin, in turn, indicated that molecular mimicry is an accepted theory for why autoimmune neuropathies exist. (*Id.* at 104.)  Although Dr. Gershwin agreed that identifying a homology (or structural similarity) would be a "good first step" for demonstrating molecular mimicry[17]  (*Id.* at

---

[17] Prior cases in the program have established that, while a demonstration of homology is threshold consideration for the invocation of molecular mimicry, it does not standing alone preponderantly support such a theory under *Althen* prong one.  *Tullio v. Sec'y of Health & Human Servs.*, No. 15-51V, 2019 WL 7580149, at *15 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), *aff'd*, 149 Fed. Cl. 448 (2020); *see also Caredio ex rel. D.C. v. Sec'y of Health & Human Servs.*, No. 17-0079V, 2021 WL 4100294, at *31 (Fed. Cl. Spec. Mstr. July 30, 2021) ("[D]emonstration of homology alone is not enough to establish a preponderant causation theory." (emphasis omitted) (citing *Schultz v. Sec'y of Health & Human Servs.*, No. 16-539V,

124-25), he acknowledged that petitioner has not come forward with any proposed molecular mimic (*Id.* at 123). Instead, he suggested that gangliosides, as can be implicated in GBS, are an important example (*Id.* at 98). Dr. Gershwin explained that gangliosides are heterogeneous and found throughout the nervous system. (*Id.* at 214-25; Ex. 57, p. 11.) And, in particular, he asserted that ganglioside diversity explains the different etiologies of GBS. (Tr. 103; Ex. 59, p. 2).) Ultimately, Dr. Gershwin relied heavily on the fact that the flu vaccine can cause GBS as evidence supporting his opinion that it can also cause SFN. (Tr. 98-99 (explaining there is a "big void" in our understanding of the antigens involved in peripheral neuropathies, but citing GBS as an established example); *Id.* at 101-02 (explaining molecular mimicry is the most likely explanation in this case because it is associated with GBS and CIDP); *Id.* at 110 (stressing epidemiologic signal relative to flu vaccine and GBS).) In fact, when asked on cross examination if he would opine that any vaccine can cause SFN, Dr. Gershwin indicated that the flu vaccine is important "because of its incrimination with GBS." (*Id.* at 120.)

Even accounting for the fact that some prior petitioners have been compensated for vaccine-caused SFN, there are several reasons why Dr. Gershwin's opinion in this particular case is not sound and reliable.[18] And, therefore, petitioner has not preponderantly demonstrated on this record that the flu vaccine can cause SFN.

---

2020 WL 1039161, at *22 n.24 (Fed. Cl. Spec. Mstr. Jan. 24, 2020))), *mot. for rev. denied*, 2021 WL 6058835 (Fed. Cl. Dec. 3, 2021).

[18] Some prior petitioners have been compensated for SFN that followed vaccination, including flu vaccinations. *E.g.*, *Johnson v. Sec'y of Health & Human Servs.*, No. 16-1630V, 2024 WL 5349150 (Fed. Cl. Spec. Mstr. Dec. 30, 2024) (hepatitis A/B vaccine); *Coons v. Sec'y of Health & Human Servs.*, No. 20-1067V, 2024 WL 1741619 (Fed. Cl. Spec. Mstr. Mar. 29, 2024) (tetanus diphtheria toxoid vaccine); *Quirino v. Sec'y of Health & Human Servs.*, No. 17-989V, 2023 WL 9229145 (Fed. Cl. Spec. Mstr. Dec. 18, 2023) (hepatitis B vaccine); *Fiske v. Sec'y of Health & Human Servs.*, No. 17-1378V, 2023 WL 8352761 (Fed. Cl. Spec. Mstr. Nov. 13, 2023) (flu vaccine); *E.M. v. Sec'y of Health & Human Servs.*, No. 14-753V, 2021 WL 3477837 (Fed. Cl. Spec. Mstr. July 9, 2021) (flu vaccine); *Swaiss v. Sec'y of Health & Human Servs.*, No. 15-286V, 2019 WL 6520791 (Fed. Cl. Spec. Mstr. Nov. 4, 2019) (Tdap vaccine). However, petitioners have not consistently been able to demonstrate that vaccinations can cause SFN. *Kelsey v. Sec'y of Health & Human Servs.*, No. 20-850V, 2026 WL 622782 (Fed. Cl. Spec. Mstr. Feb. 10, 2026) (finding that the petitioner had not presented a reliable theory for explaining how the flu vaccine can cause SFN within one day of vaccination); *Brantley v. Sec'y of Health & Human Servs.*, No. 18-1416V, 2023 WL 7924655 (Fed. Cl. Spec. Mstr. Oct. 20, 2023) (finding that that petitioner had not preponderantly demonstrated that he suffered from SFN); *Fantini v. Sec'y of Health & Human Servs.*, No. 15-1332V, 2022 WL 1760730, at *21-23 (Fed. Cl. Spec. Mstr. May 2, 2022) (finding that the petitioner had not preponderantly demonstrating that SFN was his correct diagnosis, nor had he presented a sound and reliable theory demonstrating that the flu vaccine can cause SFN); *McGill v. Sec'y of Health & Human Servs.*, No. 15-1485V, 2023 WL 3813524 (Fed. Cl. Spec. Mstr. May 11, 2023) (finding that the petitioner had not preponderantly demonstrated that either the 13-valent pneumococcal conjugate vaccine or the flu vaccine can cause SFN); *Todd v. Sec'y of Health & Human Servs.*, No. 15-860V, 2020 WL 727973 (Fed. Cl. Spec. Mstr. Jan. 8, 2020) (finding that the petitioner did not preponderantly establish that she suffered from SFN or that the flu vaccine can cause SFN). In one prior case, the undersigned found that the petitioner had provided sufficient evidence to implicate the hepatitis B vaccine as a cause of the petitioner's SFN. *Quirino*, 2023 WL 9229145, at *24. In that case, as in this case, the petitioner did rely in part on an analogy to GBS. *Id.* at *19-20. However, unlike this case, petitioner's analogy of SFN to GBS was unrebutted. *Id.* at 20. Moreover, the *Quirino* petitioner additionally provided unrebutted expert opinion establishing that the hepatitis B vaccine can cause polyarteritis nodosa, which itself is known to

Dr. Gershwin's testimony reveals that the available evidence falls woefully short of what Dr. Gershwin himself would otherwise rely upon to invoke molecular mimicry in any other context.  In his initial report, Dr. Gershwin provided an extensive discussion of the evolution of the theory of molecular mimicry (Ex. 57, pp. 3-8), culminating in a citation to a paper by Rojas et al., on which Dr. Gershwin is a listed author (Rojas et al., *supra*, at Ex. 62).  Based on that paper, Dr. Gershwin explained that there are "four major criteria" that can account for molecular mimicry:

> 1) "similarity between a host epitope and an epitope of a microorganism or environmental agent", 2) "detection of antibodies or T-cells that cross-react with both epitopes in patient with [autoimmune disease]", 3) "epidemiological link between exposure to the environmental agent or microbe and development of [autoimmune disease]", and 4) "re-producibility of autoimmunity in an animal model following sensitization with the appropriate epitopes either following infection with the microbe or exposure to the environmental trigger".

(Ex. 57, p. 8; *see also* Rojas et al., *supra*, at Ex. 62.)  Of course, requiring a full demonstration of these four specific points would arguably constitute a search for scientific certainty, which petitioner is not obligated to demonstrate.  *Accord Riese v Sec'y of Health & Human Servs.*, No.19-477V, 2025 WL 3463267, at *20 n.22 (Fed. Cl. Spec. Mstr. Nov. 3, 2025) (citing prior cases that have described the satisfaction the four criteria as the manner by which molecular mimicry can be demonstrated to scientific certainty).  However, it is striking that Dr. Gershwin conceded throughout his testimony that *none* of these criteria are met with respect to his casual theory in this case.  (Tr. 106-09.)

Dr. Gershwin did seek to explain why these criteria represent a high bar and, indeed, the Rojas et al. paper specifically indicated that "[a]lthough these criteria have existed for several years, they are challenging to demonstrate in humans for several reasons."  (Rojas et al., *supra*, at Ex. 62, p. 4.)  Nonetheless, in explaining these challenges in relation to each of the four criteria, Dr. Gershwin did cite specific examples where some of these criteria have been shown relative to other conditions.  For example, relative to the second criterion Dr. Gershwin explained that relevant antibodies have been detected for hemolytic anemia and that elevated T cells are present in autoimmune liver disease.  (Tr. 107.)  Additionally, relative to the fourth criterion, he cited the existence of mouse models for lupus and rheumatoid arthritis and explained "it's possible to develop a humanized mouse in a number of diseases."  (*Id.* at 108.)  Thus, it is not the case that any of these individual criteria in themselves present an unrealistically high bar, as Dr. Gershwin seemed to indicate.

---

cause SFN.  *Id.* at 21.  In contrast, I have also previously ruled that analogy to GBS was not sufficient to implicate the flu vaccine as a cause of SFN.  *McGill*, 2023 WL 3813524, at *26-28.

Instead, Dr. Gershwin suggests that, in contrast to other potential autoimmune conditions "in peripheral neuropathies, there is a big void in understanding what the antigens are." (Tr. 99.)  However, the literature petitioner has filed does indicate that there are mouse model experiments pertaining to peripheral sensory neuropathies (*e.g.*, Péter Sántha et al., *Role of Gangliosides in Peripheral Pain Mechanisms*, 21 INT'L J. MOLECULAR MED. 1 (2020) (Ex. 91, p. 6)) and there are studies suggesting that certain autoantibodies may be associated with small fiber neuropathy (*e.g.*, Thierry Gendre et al., *Characterizing Acute-Onset Small Fiber Neuropathy*, 11 NEUROLOGY NEUROIMMUNOLOGY & NEUROINFLAMMATION 1 (2024) (Ex. 91, p. 10)).  Therefore, it is not the case that these types of investigation are not done, it is only the case that Dr. Gershwin has not identified any of these investigations as reasonably supporting the opinion he is offering in this case.  Indeed, Rojas et al. specifically remark that, despite the challenges of demonstrating molecular mimicry, acute motor axonal neuropathy (AMAN) variant of GBS is an example of a condition that has been shown to meet all four of the criteria relative to *C. jejuni* infection.  (Rojas et al., *supra*, at Ex. 62, p. 5.)

Of course, as petitioner argues (ECF No. 97, pp. 5-6), he is not obligated to provide a detailed biologic mechanism.  *Kottenstette v. Sec'y of Health & Human Servs.*, 861 F. App'x 433, 440-41 (Fed. Cir. June 15, 2021) (citing *Knudsen*, 35 F.3d at 549; *Simanski v. Sec'y of Health & Human Servs.*, 671 F.3d 1368, 1384 (Fed. Cir. 2012)).  However, the Court of Federal Claims has previously explained that while the *Althen* Court rejected the need for scientific certainty, "in 'a field bereft of complete and direct proof of how vaccines affect the human body,' . . . [t]he standard of proof does not operate as a sliding scale that varies depending upon the quantity and quality of the scientific evidence that is available." *Caves v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 119, 143 (2011) (quoting *Althen*, 418 F.3d at 1280), *aff'd*, 463 F. App'x 932 (Fed. Cir. 2012).  Thus, with regard to the application of molecular mimicry in particular, special masters have previously stressed that "[t]he line must be drawn somewhere between speculation and certainty." *Brayboy v. Sec'y of Health & Human Servs.*, No. 15-183V, 2021 WL 4453146, at *19 (Fed. Cl. Spec. Mstr. Aug. 30, 2021).  Here, Dr. Gershwin's theory does not move meaningfully beyond speculation.

While I stress that I am not holding petitioner to the specific standard set by the Rojas et al. criteria, Dr. Gershwin's citation to these four criteria, coupled with his subsequent attempt to explain away each and every one, underscores the paucity of evidence underlying his theory.  That is, having noted the various ways in which molecular mimicry can potentially be evidenced, Dr. Gershwin confirms that he has not pursued any of those avenues.  Absent the standard articulated by Rojas et. al. – which Dr. Gershwin himself introduced into the record – he has not presented any other benchmark against which to assess whether his application of molecular mimicry to the specific context of post-flu vaccine SFN is sound and reliable.  Ultimately, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Isaac v. Sec'y of Health & Human Servs.*, No. 08-601V, 2012 WL

3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for rev. denied*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x 999 (Fed. Cir. 2013).

Indeed, petitioners who have successfully relied upon molecular mimicry have generally provided more substantial, and more persuasive evidence than has been presented here. *E.g.*, *Brayboy*, 2021 WL 4453146, at *19 (petitioner prevailed on molecular mimicry theory by presenting evidence of cross-reaction); *E.M. v. Sec'y of Health & Human Servs.*, No. 14-753V, 2021 WL 3477837, at *36-39 (Fed. Cl. Spec. Mstr. July 9, 2021) (molecular mimicry supported by proposed homology and identification of corresponding targets associated with the condition at issue); *Pierson v. Sec'y of Health & Human Servs.*, No. 17-1136V, 2022 WL 322836, at *27-31 (Fed. Cl. Spec. Mstr. Jan. 19, 2022) (petitioner prevailed on molecular mimicry theory with evidence circumstantially demonstrating a proposed homology, a relevant autoantibody, and cross-reactive potential); *Riese*, 2025 WL 3463267, at *19-22 (petitioner prevailed on molecular mimicry theory with demonstration of a proposed homology and evidence of a pathogenic antibody).

Additionally, Dr. Gershwin's reliance on GBS to circumstantially evidence the flu vaccine as a cause of SFN, which represents the core of his theory, is flawed. As Dr. Callaghan explained, SFN and GBS are "incredibly different" in that they affect different types of nerve fiber and are administered different treatments. (Tr. 162; *see also id.* at 43 (Dr. Martinez-Arizala testifying that large fiber neuropathy and small fiber neuropathy "are different diseases" that "affect different fibers").) In particular, whereas GBS is a condition affecting the large fiber nerves, SFN by definition does not include large fiber nerve involvement. (*Id.* at 162.) Thus, Dr. Callaghan opined that the cause(s) of GBS are not informative of the causes of SFN. (*Id.*; *Accord McGill v. Sec'y of Health & Human Servs.*, No. 15-1485V, 2023 WL 3813524, at *26-28 (Fed. Cl. Spec. Mstr. May 11, 2023) (finding GBS to be a "flawed" analogy relative to small fiber neuropathy and accepting respondent's expert's testimony that "molecular mimicry involves a specific interaction that is not generalizable across differing contexts" and that "molecular mimicry is not the cause of all autoimmune disease"); *see also Houston v. Sec'y of Health & Human Servs.*, No. 18-420V, 2021 WL 4259012, at *16-17 (Fed. Cl. Spec. Mstr. Aug. 19, 2021) (explaining that "the filed literature establishes that CIDP should not be viewed as merely a 'chronic' form of GBS, even though both are peripheral neuropathies involving nerve demyelination" and that "while there is evidence supporting molecular mimicry as a disease mechanism driving GBS, Dr. Callaghan explained that there is no comparable evidence associating molecular mimicry with CIDP").)

Dr. Gershwin opined that, despite being a different disease, GBS is "relevant just on the basis of the principle of immune tolerance. It's relevant just by the multiple number of environmental agents that can induce it, and it's also relevant because of the antigens involved." (Tr. 220.) However, none of these points are persuasive. Of these three points, only the final point – asserting that the antigens are relevant – is one that would have any potential to evidence that what is true of GBS would likewise be true of a different condition. On that point, Dr. Gershwin opined, as noted above, that his

36

opinion rests on the presumption that, if the flu vaccine can stimulate anti-ganglioside antibodies via molecular mimicry to result in GBS, then it is also reasonable to conclude that the same process can result in SFN, because gangliosides are found throughout the nervous system.  (*Id.* at 98-99, 101-02, 120-21.)

Yet, the literature filed in this case suggests that Dr. Gershwin's opinion oversimplifies the nature of gangliosides and the degree to which they can support a direct analogy between SFN and GBS.  As Dr. Gershwin acknowledged during the hearing, although gangliosides are found throughout the nervous system, they are not all the same.  (Tr. 103.)  In fact, the literature petitioner filed explains that gangliosides are widely expressed throughout mammalian tissues (Juliana F. Vasques et al., *Gangliosides in Nervous System Development, Regeneration, and Pathologies*, 18 NEURAL REGENERATION RSCH. 81 (2023) (Ex. 93, p. 1)), and that 188 different gangliosides have been identified with different carbohydrate structures in vertebrates (Robert K. Yu et al., *Structures, Biosynthesis, and Functions of Gangliosides: An Overview*, 60 J. Oleo Sci. 537 (2011) (Ex. 72, p. 1)).  Thus, in his initial report, Dr. Gershwin acknowledged that the "location and density of given gangliosides may be different in varying neurologic fibers."  (Ex. 57, p. 11.)  In his second report he further noted that "[g]angliosides are amongst the most structurally diverse antigens in the human body."  (Ex. 59, p. 2.)

Citing Menichella et al., a study of SFN in type 2 diabetes, Dr. Gershwin sought to implicate the GM3 ganglioside in the pathogenesis of SFN.  (Ex. 59, p. 3 (quoting Daniela M. Menichella et al., *Ganglioside GM3 Synthase Depletion Reverses Neuropathic Pain and Small Fiber Neuropathy in Diet-Induced Diabetic Mice,* 12 MOLECULAR PAIN 1 (2016) (Ex. 94)).)[19]  However, Dr. Gershwin never identified which gangliosides may be implicated in GBS.  Yet, in seeking to marry up the neurologic and immunologic aspects of petitioner's theory, Dr. Martinez-Arizala had previously opined that the link between the flu vaccine and GBS was confirmed experimentally in a study that implicated anti-GM1 antibodies in the pathogenesis of GBS.  (Ex. 17, pp. 5-6 (citing Irving Nachamkin et al., *Anti-Ganglioside Antibody Induction by Swine (A/NJ/1976/H1N1) and Other Influenza Vaccines:  Insights into Vaccine-Associate Guillain Barré Syndrome*, 198 J. INFECTIOUS DISEASES 227 (2008) (Ex. 25)).)  Given that the available literature explains that these differing gangliosides (GM3 vs GM1) are structurally different, and given that molecular mimicry is based upon similarity of structure between host and antigen, it would have been incumbent upon Dr. Gershwin to explain, if his analogy to GBS was to hold, how demonstrated molecular mimicry vis-à-vis one of these gangliosides (GM1) would be informative of the potential molecular mimics of the other (GM3).  However, he did not attempt to do so.

Instead, Dr. Gershwin simply asserted that "there is [an] enormous amount of data that we still need to understand the antigenicity of the human neurologic system" and stated of the diversity of gangliosides that "it explains the different etiologies of

---

[19] Other literature filed by petitioner also suggests that C and Aδ fibers, which are part of the small nerve fibers, are associated with GD1a or Gb3 gangliosides.  (Sántha et al., *Role of Gangliosides in Peripheral Pain Mechanisms*, 21 INT'L J. MOLECULAR SCIENCES (2020), at 1 (Ex. 96, pp. 2-3).)

GBS." (Tr. 103.)  Yet, these assertions hinder more than they help petitioner's *Althen* prong one showing.  Dr. Gershwin's explanation that the diverse causes of GBS are explained by diverse antigens having separate relationships to different gangliosides directly undercuts his attempt to simply rely on the category of gangliosides generically as well as his attempt to extend the specific relationship between the flu vaccine and one such ganglioside to other peripheral nervous system disorders.  Afterall, as Dr. Gershwin explained, "location and density of given gangliosides may be different in varying neurologic fibers." (Ex. 57, p. 11.)  Dr. Gershwin also testified that the immune system is promiscuous and overlapping, seeming to suggest that these nuances do not reflect the actual reality of the immune system.  (Tr. 112-13 (stating that "not everything fits as neatly as we'd like").)  However, absent any other meaningful basis for invoking molecular mimicry between any component of the flu vaccine and the small fiber nerves, such a catchall assertion is not enough to salvage either Dr. Gershwin's analogy to GBS or his theory overall.

Dr. Gershwin additionally cited a study by Alaedini et al. for the proposition that gangliosides are implicated in the development of neuropathic pain in the context of SFN.  (Tr. 215-16 (citing Armin Alaedini et al., *Antiganglioside Antibodies in Multifocal Acquired Sensory and Motor Neuropathy*, 60 ARCHIVES NEUROLOGY 42 (2003) (Ex. 92)).)  That study tested serum samples from 25 patients with multifocal acquired sensory and motor neuropathy for antiganglioside antibodies.  (Alaedini et al., *supra*, at Ex. 92, pp. 1-2.)  They concluded that these antibodies were present regardless of whether the condition was demyelinating.  (*Id.* at 5.)  Dr. Gershwin opined that the study showed that anti-ganglioside antibodies are not limited to GBS.  (Tr. 215-16.)  However, there are several reasons why this study is not informative in this case.  First, as Dr. Gershwin acknowledged, petitioner did not suffer the type of neuropathy Alaedini et al. examined. (*Id.* at 220-21.)  Second, all 12 of the study subjects who tested positive for anti-ganglioside antibodies had demonstrated motor weakness indicative of large fiber involvement in addition to sensory symptoms.  (Alaedini et al., *supra*, at Ex. 92, p. 3.)  Thus, this study does not provide good evidence of what antibodies would be present in the absence of a large fiber neuropathy, such as what would be seen in small fiber neuropathy.  Third, the study authors otherwise acknowledge that generally anti-GM1 antibodies are associated with motor neuropathy whereas GD1b is associated with sensory neuropathy.  (*Id.* at 1.)  And, fourth, even taking the study conclusion entirely at face value as evidence that this type of neuropathy can have an immune pathogenesis, nothing in this paper purports to implicate the flu vaccine as a cause of the condition. (*Id.* at 5.)

Finally, I note in a more summary fashion several other points that I have considered, but which I find do not meaningfully buttress Dr. Gershwin's molecular mimicry theory or otherwise support petitioner's burden of proof under *Althen* prong one.  First, I have taken into account that petitioner's treating neurologist, Dr. Sandroni, documented in her medical record in connection with her small fiber neuropathy diagnosis that "I think [] what happened [] was an autoimmune response triggered by

38

the flu shot, and the body attacked itself."[20]  (Ex. 5, p. 30.)  While this statement is potentially consistent with petitioner's expert presentation, it does not contain any additional reasoning or point to any additional evidence that would supplement or better support the theory that has been offered.[21]  Second, I note that Dr. Martinez-Arizala confirmed during his testimony that, even if petitioner did not qualify for a small fiber neuropathy diagnosis in particular, he would still maintain that an autoimmune peripheral neuropathy more broadly could still be caused by the flu vaccine.  (Tr. 82-83.) This is also consistent with Dr. Sandroni's reassessment of petitioner's condition as constituting a "post vaccine neuritis."  (Ex. 5, p. 8; *see also* Tr. 79-80 (Dr. Martinz-Arizala explaining that "neuritis" is an umbrella term).)  However, even in the context of that fallback position, many of the above-discussed issues would still apply.  Indeed, it is difficult to see how petitioner's theory of causation could benefit from being more vague. Finally, I acknowledge that petitioner has presented some case reports which he argues suggest that the flu vaccine can cause SFN.  (*E.g.*, Hull et al., *supra*, at Ex. 27, pp. 4-5; Vital et al., *supra*, at Ex. 28; Lorenzoni et al., *supra*, at Ex. 29; Kafaie et al., *supra*, at Ex. 30; Souayah et al., *supra*, at Ex. 31)  However, these case reports are not strong enough evidence to overcome the significant shortcomings of petitioner's *Althen* prong one presentation.[22]

---

[20] Petitioner took the unusual step of submitting the curriculum vitae for Dr. Sandroni.  (Ex. 98.)  He argues that she is "world renowned" as an expert in peripheral autoimmune neuropathies.  (ECF No. 97, pp. 12-13.)  However, having reviewed that CV, petitioner misstates Dr. Sandroni's specific area of expertise.  To be sure, Dr. Sandroni is a well credentialed neurologist with experience related to neuropathic pain and peripheral neuropathies.  (*See* Ex. 98.)  However, her CV indicates that her specific subspecialty is autonomic disorders, not peripheral neuropathies.  (*Id.*)  And, while autonomic conditions can overlap with autoimmune neuropathies, they are not coextensive.  Nor has petitioner actually substantiated Dr. Sandroni's renown.  Although Dr. Martinez-Arizala characterized Dr. Sandroni as a renowned expert in peripheral neuropathies (Ex. 17, p. 4), he never explained his basis for this characterization.  Dr. Callaghan, by contrast, explained that due to his role on the editorial board of the journal *Neurology* he is very familiar with the Mayo Clinic, and particularly their top physicians for neuropathy, and Dr. Sandroni is not one of them (Tr. 173-74; Ex. D, p. 5).

[21] I am mindful that the purpose of medical treatment records is to guide diagnosis and treatment rather than to specifically substantiate or explain a potential causal relationship.  In my own experience reviewing medical records, treating physicians do not typically document their reasoning in detail. However, the fact that such explanation is not necessarily to be expected does not create evidence where it otherwise does not exist.  Indeed, that is exactly why so many cases in this program require expert medical opinions even where the Vaccine Act allows petitioners to demonstrate their entitlement by either medical records or medical opinion.  § 300aa13(a)(1).  The issue here is that, given that Dr. Gershwin presented an opinion that I cannot credit as sound and reliable, petitioner's expert presentation falls so far short of meeting his preponderant burden of proof under *Althen* prong one that the mere fact of Dr. Sandroni's endorsement of a potential autoimmune process is not enough to overcome the deficiencies explained above.

[22] Petitioners in this program often highlight the usefulness of case reports in cases of rare diseases or unusual occurrences.  *E.g.*, *Patton v. Sec'y of Health & Human Servs.*, 157 Fed. Cl. 159, 166-68 (2021). However, case reports "do not purport to establish causation definitively, and this deficiency does indeed reduce their evidentiary value," even though they are not entirely devoid of evidentiary value.  *Paluck v. Sec'y of Health & Human Servs.*, 104 Fed. Cl. 457, 475 (2012) (quoting *Campbell v. Sec'y of Health & Human Servs.*, 97 Fed. Cl. 650, 668 (2011)).  Based on my review of the specific case reports filed in this case, they are insufficient to carry petitioner's burden of proof.  Although the six publications cited by Dr. Martinez-Arizala account for 27 individual cases, they are not uniform in either clinical presentation or

In light of all of the above, petitioner has not met his preponderant burden of proof under *Althen* prong one.

### b. *Althen* prong two

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326-27; *Grant*, 956 F.2d at 1147-48. Medical records are generally viewed as particularly trustworthy evidence. *Cucuras*, 993 F.2d at 1528. However, medical records and/or statements of a treating physician's views do not *per se* bind the special master. *See* § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder*, 88 Fed. Cl. at 745 n.67 ("[T]here is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted."). A petitioner may support a cause-in-fact claim through either medical records or expert medical opinion. § 300aa-13(a). The special master is required to consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines*, 940 F.2d at 1528).

Petitioner argues that he has satisfied *Althen* prong two because he has demonstrated that he suffered an onset of symptoms of SFN about ten days post-vaccination, which "aligns perfectly with the expected timeframe for an adaptive immune response, a critical factor in establishing causation." (ECF No. 97, p. 10 (citing Ex. 33, p. 3; Ex. 57, pp. 12, 15).) In particular, petitioner stresses that the hot burning sensation in his hands and feet "fit the classic presentation of SFN." (*Id.*) Although he acknowledges that his waxing and waning presentation would be atypical for idiopathic SFN, he contends that it remains "within the spectrum of immune-mediated neuropathies." (*Id.* at 11.) Further to this, petitioner raises several specific points. (*Id.* at 11-14.) First, the timing of onset is consistent with Dr. Gershwin's molecular mimicry theory. (*Id.* at 11.) Second, even accounting for the fact that a temporal association alone is insufficient to prove causation, the "broader context" of a sudden and progressive post-vaccination onset of symptoms represents a "robust" explanation for the injury. (*Id.*) Third, a "world-renowned" expert in autoimmune peripheral neuropathy at the Mayo Clinic, referring to Dr. Sandroni (*but see supra* note 20), recognized that petitioner experienced a vaccine-related autoimmune neuropathy, strongly supporting petitioner's SFN diagnosis, which is also further supported by the preceding clinical observations of his other treating physicians, as well as his casual showing. (*Id.* at 12-

---

proposed theory of causation (where a theory is even presented). Ultimately, none of the publications provide any useful data beyond a purported temporal association. However, "single case reports of Disease X occurring after Factor Y . . . do not offer strong evidence that the *temporal* relationship is a *causal* one—the temporal relationship could be pure random chance." *Crutchfield v. Sec'y of Health & Human Servs.*, No. 09-0039V, 2014 WL 1665227, at *19 (Fed. Cl. Spec. Mstr. Apr. 7, 2014), *mot. for rev. denied*, 125 Fed. Cl. 251 (2014).

13.)  Fourth, petitioner's SFN diagnosis was appropriately reached via differential diagnosis.  (*Id.* at 13-14.)  And, finally, respondent has not raised any plausible alternative diagnosis.  (ECF No. 103, p. 4.)  I have carefully considered petitioner's arguments, including his significant reliance on the opinion of his treating neurologist, Dr. Sandroni; however, petitioner's arguments are unpersuasive.

Petitioner relies in significant part on "the critical process of differential diagnosis, which was rigorously applied in [his] case to rule out alternative explanations for his symptoms."  (ECF No. 97, p. 13.)  Thus, his neurology expert, Dr. Martinez-Arizala, summed up his diagnostic opinion during the hearing as follows: "The clinical presentation is so typical, and when you exclude everything else, I mean, you have – you really – that's the only thing that I can think is left in the bottom of the basket."  (Tr. 83.)  However, without doubting the value of the differential diagnostic process generally, it has not been persuasively applied in this case.  As Dr. Martinez-Arizala explained during the hearing, a differential diagnosis is a broad "menu" of potential working diagnoses that must then be subjected to investigation.  (*Id.* at 35.)  Thus, for example, Dr. Callaghan agreed that it was reasonable for SFN to initially be included in petitioner's differential diagnosis (*Id.* at 172-73, 180), but he nonetheless opined that the suspicion for SFN remained very low, so low that testing wasn't even warranted (*Id.*).

Petitioner is not persuasive in asserting that his subjective sensory symptoms are sufficient to support a diagnosis of SFN.[23]  Dr. Martinez-Arizala agreed that the diagnostic criteria by Devigili et al. are not only "acceptable" and "valuable" but, in fact, typically used in clinical practice.  (Tr. 62-63, 85.)  And under those criteria, petitioner does not have SFN.  To meet these diagnostic criteria, petitioner would need to have some objective evidence in addition to his sensory symptoms to support the diagnosis (*Id.* at 69); however, Dr. Martinez-Arizala acknowledged that he does not (*Id.* at 66-68).  Nonetheless, Dr. Martinez-Arizala sought to distinguish "meeting the criteria" from "making a diagnosis."  (*Id.* at 69.)  He opined that, given that no test is perfectly sensitive or specific, a neurologist may still make a diagnosis of SFN even if the criteria are not met.  (*Id.* at 70-71.)  However, a follow up validation study by Devigili et al., as cited by respondent, confirmed that reliance on sensory symptoms alone does not *reliably* diagnose SFN.  (Divigili et al., *supra*, at Ex. C, Tab 1, p. 7.)  In any event, regardless of whether these criteria are strictly required, Dr. Martinez-Arizala agreed that "generally, yes, you like to see those."  (Tr. 64.)

Dr. Martinez-Arizala additionally discussed a paper by Saperstein on this point.  (Tr. 64, 70.)  However, while the Saperstein article does stress the fact that SFN can have a variable presentation, it does not specifically counsel that SFN should be diagnosed based on clinical presentation alone.  Instead, it states that nerve fiber density biopsies are "especially useful" and that history and examination at best allow for SFN to be "strongly suspected."  (Saperstein, *supra*, at Ex. A, Tab 3, pp. 2, 11.)

---

[23] Dr. Martinez-Arizala also noted that petitioner had a finding of mild cardiovagal impairment, which he indicated is suggestive of a limited autonomic neuropathy, and would represent a "subtle" abnormality that is "compatible" with SFN.  (Tr. 41.)  However, he acknowledged that it is not diagnostic of SFN in itself.  (*Id.* at 43-44.)

41

Moreover, as Dr. Callaghan further stressed, it is not simply that petitioner was not objectively tested for SFN.  He was tested and his results came back negative for SFN, including his skin biopsy, which Dr. Callaghan explained is the "gold standard" test for SFN.  (Tr. 150, 182.)  Although Dr. Martinez-Arizala maintained that petitioner could still have SFN even with a negative skin biopsy (*Id.* at 41, 47-48), he nonetheless agreed on cross examination that it is generally accepted that skin biopsy is very sensitive for SFN (*Id.* at 68-69; *see also* Ex. 17, p. 5 (stating "the use of skin biopsies is more sensitive than the clinical examination")).

Even setting aside the diagnostic criteria for SFN entirely, it is not error for a special master to focus on objective testing when faced with inconclusive medical records.  *Hibbard v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 742, 749 (2011) (explaining that "[w]ith an extensive set of medical records from nearly twenty different doctors, many of which are inconclusive, the special master focused on the results of objective testing and the relative persuasiveness of the competing expert witnesses.  The Court cannot hold that this evaluation of the evidence was arbitrary or capricious"), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012).  In that regard it is significant that Dr. Sandroni – who petitioner stresses as the treating neurologist that rendered the SFN diagnosis – did not actually maintain that assessment after petitioner's workup came back unremarkable.  Specifically, when Dr. Sandroni initially saw petitioner on January 31, 2017, she diagnosed SFN based on his symptoms, examination, and history.  (Ex. 5, p. 30.)  However, when petitioner returned for a review of his test results, including a normal biopsy, Dr. Sandroni switched to a diagnosis of an unspecified "neuritis" (*Id.* at 8), which Dr. Martinez-Arizala confirmed to be an umbrella term for peripheral neuropathies more broadly (Tr. 79-80).

Additionally, although none of the specific exclusionary criteria under the SFN diagnostic standard are present (*see supra* note 14), Dr. Callaghan is persuasive in explaining that several other features of petitioner's condition suggest that SFN may not be the best explanation for his condition.  He explained that

> [i]n this case [] this is not isolated problems with numbness, tingling, and pain as is often seen in neuropathy.  There were [] over probably 30 different complaints in and around the time that this started and continuing evolving over many months, and the vast majority of those symptoms were not consistent at all with a small fiber neuropathy.

(Tr. 151.)  Specifically, Dr. Callaghan cited symptoms of sore and tired muscles, arm and leg heaviness, generalized weakness, diffuse joint pain, cramping, fatigue, nausea and loss of appetite, and burning sensation in the esophagus or sensation of a golf ball stuck in his throat, flushed face, difficulty concentrating, difficulty breathing, intermittent lightheadedness, and a vibration sensation in many parts of the body.  (*Id.* at 151-52.)  Moreover, Dr. Callaghan noted that petitioner's symptoms were fluctuating and migratory.  (*Id.* at 154.)  And he explained, in particular, that peripheral nerves do not heal quickly.  (*Id.*)  Accordingly, the fact that petitioner's symptoms would "come and go" rather than continually accrue, is not consistent with a physiologic neuropathy.  (*Id.*)

42

Instead, Dr. Callaghan opined that petitioner's overall symptom presentation is more consistent with a centralized pain state.  (Tr. 154; Ex. C, p. 7.)  Noting that petitioner had preexisting conditions that are likewise indicative of a centralized pain state, including fibromyalgia, irritable bowel syndrome, and esophageal spasms (Tr. 155), Dr. Callaghan opined that petitioner's alleged neuropathic symptoms, though new symptoms in themselves, are better viewed as an evolution of his overall preexisting symptomology related to his centralized pain state.  (*Id.* at 154-55.)  Moreover, petitioner also had preexisting anxiety and a panic disorder, which often goes hand in hand with a centralized pain state.  (*Id.* at 155-56.)  Further still, Dr. Callaghan stressed that petitioner's medical records reflect that he complained of specific life stressors around the time of the onset of these new symptoms.  (*Id.*)  According to Dr. Callaghan, these three conditions reflecting a centralized pain state, either any one individually or especially all three collectively, would be a better explanation for petitioner's overall constellation of symptoms.  (*Id.*)

Dr. Martinz-Arizala testified that he did not agree that fibromyalgia and/or anxiety were the cause of petitioner's symptoms.  (Tr. 44.)  Although petitioner's anxiety had been raised, he noted that the treating physicians did not actually opine that the symptoms were anxiety related.  (*Id.*)  Moreover, based on petitioner's testimony, Dr. Martinez-Arizala doubted that petitioner even had fibromyalgia, stressing it to be a clinical diagnosis.  (*Id.* at 45.)  However, petitioner's other expert, Dr. Gershwin, who is board-certified in rheumatology, remarked that petitioner is a "poster child for fibromyalgia" with accompanying anxiety from early life and current stress.  (*Id.* at 217.)  He suggested only that the specific symptoms constituting the alleged SFN are not symptoms of fibromyalgia itself, further noting that fibromyalgia coupled with an autoimmune neuropathy would be an outlier presentation.  (*Id.*)  Yet, Dr. Callaghan explained that petitioner has a clearly demonstrated presence of three different chronic, overlapping, centralized pain conditions coupled with an extensive, but completely normal neurologic workup.  (Ex. C, p. 7.)  In that context, it is "a little arbitrary" to seek to place specific symptoms "in the fibromyalgia bucket."  (Tr. 184-85.)  Nonetheless, Dr. Callaghan did opine that nociplastic pain, which is the type of pain experienced as part of fibromyalgia, can present similarly to neuropathic pain.  (*Id.* at 184.)  Although Dr. Callaghan's competing assessment does not entirely rule out the potential presence of a neuropathy, it does raise a serious question as to whether it is reasonable in this specific case to rely on sensory symptoms alone to diagnosis SFN.

I additionally note that Dr. Sandroni's diagnosis and opinion are not controlling for a couple of reasons.  First, although her assessment must be carefully considered as that of a treating physician within an appropriate specialty and does ultimately carry some weight, it stands against the overall weight of the medical records.  *Accord Hibbard*, 698 F.3d at 1367-68 (finding no error where the special master weighed treating physician opinions against other evidence of record, including the opinions of other treating physicians).  Prior to seeing Dr. Sandroni, petitioner's treating physicians were consistently concerned that his presentation was atypical of SFN and that his symptoms were instead at least suspicious for potential manifestations of stress and

43

anxiety. (*E.g.*, Ex. 3, p. 2 (documenting that petitioner appeared anxious and that he was feeling stressed due to a parent's illness); Ex. 10, p. 17 (noting that petitioner would benefit from a mental health evaluation and professional help managing his anxiety); *Id.* at 66, 69 (encouraging petitioner to schedule an appointment with behavioral health for his anxiety); Ex. 13, pp. 98-101 (documenting that petitioner was experiencing multiple life stressors and that while SFN was a possibility, many of petitioner's symptoms were atypical for SFN); Ex. 15, p. 148 (documenting that given petitioner's history of fibromyalgia, anxiety, and panic disorder that it was unclear if his symptoms were due to a somatization disorder and recommending petitioner be evaluated by pain psychology).) And, although Dr. Finnessy initially accepted Dr. Sandroni's assessment, he later came to refer petitioner to another neurologist. (Ex. 15, pp. 1171-72 (referring petitioner to another neurologist "to see if they can provide insight" on petitioner's persistent sensory symptoms despite treatment with magnesium and Solu-Medrol infusions).) After review of petitioner's overall history, Mayo Clinic evaluation, and subsequent treatment history, Dr. Atkinson stressed that, while an immune mediated small fiber neuropathy had been "hypothesized" to explain his symptoms, the Mayo Clinic's "very extensive workup" revealed "no specific abnormalities or answers found." (*Id.* at 1181 (confirming receipt of Mayo Clinic records); *Id.* at 1199 (assessment and plan).) Moreover, he noted that petitioner's prior treatments, including the IV Solu-Medrol Dr. Sandroni initially recommended in connection with the suspicion of small fiber neuropathy (*see* Ex. 5, p. 30), had not been successful in the longer term. (Ex. 15, pp. 1194-95.) A third neurologist, Dr. Zerofsky, also later assessed "generalized probable neuropathic pain." (Ex. 13, p. 156.) Noting the Mayo Clinic's prior workup, he referred to an autoimmune etiology as merely being "presumed" based on the prior Mayo Clinic diagnosis, though he likewise noted that petitioner's Mayo Clinic workup to have been unrevealing. (*Id.* at 156-57.) And, later still, petitioner had a multidisciplinary consultation, which included neurology, wherein it was concluded that petitioner's "pain itself is unusual" and that his clinical course "does not follow the pattern of a peripheral neuropathy." (Ex. 32, pp. 189-90.) Even accepting that petitioner was experiencing an unspecified pain syndrome with neuropathic feature that followed vaccination by history, this multidisciplinary team ultimately concluded that petitioner's "specific diagnosis is unclear." (*Id.* at 190.)

Second, although treating physician opinions are probative and often favored, *Capizzano*, 440 F.3d at 1326, ultimately, as with opining experts, the basis for those views must be assessed, *e.g.*, *Hughes v. Sec'y of Health & Human Servs.*, No. 16-930V, 2021 WL 839092, at *20 (Fed. Cl. Spec. Mstr. Jan. 4, 2021), *mot. for rev. denied*, 154 Fed Cl. 640 (2021); *see also Caves v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 119, 136-37 (2011) (noting special masters must consider, but are not bound by, treating physician opinions), *aff'd*, 463 Fed. Appx. 932 (Fed. Cir. 2012). In particular, the value of treating physician opinions is generally premised on their familiarity with the patient's history and their ability to observe the patient "as the condition unfolded." *Nuttall v. Sec'y of Health & Human Servs.*, 122 Fed. Cl. 821, 832-33 (2015), *aff'd*, 640 F. App'x 996 (Fed. Cir. 2016). Here, however, as Dr. Callaghan pointed out, despite the fact that petitioner had a documented history of a panic disorder and anxiety as well as fibromyalgia and irritable bowel syndrome, both of which are consistent with a

44

centralized pain state (Ex. C, p. 7; Tr. 154-55, 184-85), and despite the fact that petitioner's anxiety and life stressors were a concern from the very first time he sought treatment for his alleged neuropathic symptoms from Dr. Finnessy (Ex. 3, pp. 1-2), Dr. Sandroni documented as part of her initial evaluation that petitioner had "really no prior medical history of sort except for sleep apnea" (Ex. 5, p. 28).[24]  Given the issues raised by Dr. Callaghan, this casts significant doubt on both Dr. Sandroni's initial small fiber neuropathy diagnosis and her causal opinion.  Additionally, although Dr. Sandroni had some follow-ups with petitioner, the record does not reflect that she had a sustained treatment history with petitioner.  Instead, it was petitioner's second neurologist, Dr. Atkinson, who subsequently had the benefit of knowing that the treatments initiated on the presumption that petitioner was experiencing an autoimmune neuropathy were ultimately ineffective.  (Ex. 15, pp. 1194-95, 1199 (documenting that petitioner's various prior treatments, including intravenous Solu-Medrol, were largely unsuccessful).)   And Dr. Zerofsky also later documented that petitioner "does have very major stressors" that he was able to observe were making petitioner's symptoms worse.  (Ex. 13, p. 185.)

Finally, it is important to note that "[a]lthough probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation."  *Althen*, 418 F.3d at 1278 (citing *Grant*, 956 F.2d at 1149).  In that regard, while Dr. Martinez-Arizala stressed that nothing in petitioner's clinical course clearly rules out SFN and that a vaccine-caused neuropathy represents the "bottom of the basket" (Tr. 41, 83-84), it is also the case that SFN can be idiopathic (*Id.* at 62).  In fact, Dr. Martinz-Arizala agreed that the Saperstein article suggests that half of SFN cases are considered idiopathic.  (*Id.* (discussing Saperstein, *supra*, at Ex. A, Tab 3).)  And, to the extent the SFN diagnosis itself is in doubt, he further indicated a significant proportion of other forms of peripheral neuropathy (30% or more) are also idiopathic.  (*Id.*)  Dr. Martinez-Arizala suggested in testimony that it is not at all unusual for peripheral neuropathy patients, such as petitioner, to be treated for their symptoms without ever knowing the underlying cause.  (*Id.* at 43.)  Accordingly, given the condition allegedly at issue, it is not unexpected that the "bottom of the basket" arrived at by Dr. Martinez-Arizala would still fail to include a causal explanation for petitioner's symptoms.  Thus, even accounting for Dr. Martinez-Arizala's explanation that many other potential causes were excluded (*Id.* at 39-47), the fact that the etiology of petitioner's symptoms cannot be definitively resolved does not distinguish petitioner from the typical peripheral neuropathy patient and, therefore, does not imply vaccine causation without more.

---

[24] During cross-examination, petitioner's counsel pressed Dr. Callaghan very hard on the question of whether it was speculative of him to conclude that Dr. Sandroni had no access to petitioner's prior history, stressing that the records do not confirm whether Dr. Sandroni had access to petitioner's prior records. (Tr. 175-77.)  And, indeed, Dr. Sandroni's record does make reference to "scanning" some unspecified records for petitioner's history. (Ex. 5, p. 28.)  However, Dr. Callaghan reasonably maintained that the history of present illness Dr. Sandroni recorded is the best indicator of what she actually considered in reaching her conclusions.  (Tr. 160, 175-77.)  Indeed, regardless of whether Dr. Sandroni had access to all of the prior records, her assessment does not document any consideration of petitioner's anxiety, panic disorder, or fibromyalgia.

### c. *Althen* prong three

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1278. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* at 1281. A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.*; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *mot. for recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd per curiam*, 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. denied sub nom.*, *C.K. v. Sec'y of Health & Human Servs.*, 113 Fed. Cl. 757 (2013), *aff'd sub nom.*, *Koehn v. Sec'y of Health & Human Servs.*, 773 F.3d 1239 (Fed. Cir. 2014).

Here, there is no dispute that petitioner's symptoms of his alleged neuropathy arose post-vaccination. (ECF No. 86, p. 1.) Moreover, respondent does not challenge petitioner's assertion that the symptoms arose approximately 10-days post vaccination. (*Compare* ECF No. 95, *with* ECF No. 97.) However, respondent does argue that, because petitioner has not met his burden of proof under either *Althen* prong one or two, then he by definition cannot satisfy *Althen* prong three. (ECF No. 95, p. 29.) Given the preceding analyses, respondent is persuasive on this point.

In any event, even assuming that petitioner satisfied *Althen* prong three, that alone would not satisfy petitioner's overall burden of proof. *Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting [the] vaccine and injury"), *aff'd per curiam sub nom.*, *Veryzer v. United States*, 475 F. App'x 765 (Fed. Cir. 2012); *Hibbard*, 698 F.3d at 1364-65 (holding that the special master did not err in resolving the case pursuant to *Althen* prong two when respondent conceded that petitioner met *Althen* prong three). Moreover, even if further assuming petitioner had also met his burden under *Althen* prong one, the Federal Circuit has explicitly endorsed that, even where a petitioner has met *Althen* prongs one and three, it may still be appropriate in some circumstances to conclude under *Althen* prong two that the probability of coincidence or another cause prevents the conclusion that the vaccine caused the injury. *Capizzano*, 440 F.3d at 1327. In this case, *Althen* two would still remain dispositive for the reasons discussed above.

## VI.    Conclusion

There is no question that petitioner has suffered and that the events discussed throughout this decision profoundly affected his life. He has my sympathy, and I do not question his sincerity in bringing this claim. However, for all the reasons discussed

above, I find that petitioner has not met his burden of proof in this case.  Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation.  Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master
